UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

MOHAMMED SOLIMAN,                                    14-cv-5951 (DLI) (RER)

                        Plaintiff,

               - against -

MAERSK LINE LIMITED and the vessel M.V. Maersk
Idaho, Official No. 1217920, her engines, tackle gear,
cargo and appurtenances, etc. in Rem,

                  Defendants.

-------------------------------------------------------------------x

## DEFENDANT'S POST-TRIAL BRIEF

FREEHILL HOGAN & MAHAR LLP
*Attorneys for Defendant*
*Maersk Line Limited*
80 Pine Street, 25th Floor
New York, New York 10005-1759
Telephone: (212) 425-1900
Facsimile: (212) 425-1901
Walsh@Freehill.com

John J. Walsh
Of Counsel

458802.1

# TABLE OF CONTENTS

I.    THEY USE OF "A" DECK FOR STAGING THE GARBAGE
      BAGS WAS REASONABLE ........................................................................ 1

II.   THERE WAS NO VIOLATION OF THE ISM OR ANY SAFETY
      MANAGEMENT SYSTEM RULE OR REGULATION ............................ 5

III.  GARBAGE BAGS ARE NOT WEIGHED ................................................ 10

IV.   THE GARBAGE WAS NOT COMPACTED ............................................ 12

V.    THE SHIP CANNOT BE MADE ACCIDENT FREE ............................... 13

      A. "Relaxed" Standard of Care Implicitly Overruled ................................... 13

      B.   Some Negligence has to be Proven ......................................................... 15

      C. Proximate Causation is the Substantial Factor Standard in
         Unseaworthiness Cases ........................................................................... 17

VI.   PLAINTIFF WAS CONTRIBUTORILY NEGLIGENT ......................... 20

VII.  A FUTURE PAIN AND SUFFERING AWARD OF $500,000
      WOULD BE EXCESSIVE IN LIGHT OF PLAINTIFF'S
      TESTIMONY AND LIFE EXPECTANCY ............................................. 22

VIII. PLAINTIFF SHOULD NOT BE AWARDED PAIN AND
      SUFFERING DUE TO HIS FAILURE TO MITIGATE ......................... 24

I.   **THE USE OF "A" DECK FOR STAGING THE GARBAGE BAGS WAS REASONABLE.**

Up until his cross examination at trial, which occurred the day after his direct examination, Plaintiff never raised the theory that the garbage bags should have been loaded directly into the staged cargo net while the ship was underway, to avoid having to stack the bags under the ladder on "A" deck. (See  Tr. at p. 178, l. 22-24).  Plaintiff had testified in deposition that there was nothing wrong with the ship that caused his injuries and that nothing which any crewmember had done caused his injuries.   Plaintiff had been asked whether there was something about the way the ship handled the garbage that was a factor in his injury and he responded in the negative.  (Tr. at p. 177-178, l. 25-3). He was performing a routine every day operation which he had done hundreds of times the same way: stacking the bags under the ladder on "A" deck for transfer to the cargo net that was to be used only when in port.

Suddenly, overnight, at trial in between the direct and cross examinations, the plaintiff contrived and conjured up a new theory:  that the ship could have loaded the bags directly into the cargo net, after she had passed the breakwater and the winch, boom and net could be deployed without concern from movement due to wave action.  (Tr. at p. 178, l. 22-24) The Court should not accept such a late arriving theory and should reject it as incredible.

There was no expert testimony that the ship was being unreasonable in making the garbage transfer in two distinct operations: moving the bags to "A" deck, stacking them *out of the way* until arrival in Algeciras, and then transferring them into the net.  Plaintiff's own maritime expert, Mitchell Stoller, who conceded that bags could not simply be thrown from the stern, did not propose any plausible alternative to stacking the garbage bags on "A" deck where they would be jettisoned using the ship's crane.  (Tr. at p. 287, l. 1-2)

This last minute contrivance, not ratified in any capacity by Mr. Stoller, cannot be deemed a plausible and safe alternative.   Had it been proposed as a theory going into the trial, it would have been negated for a number of reasons: first, passageways must not be blocked under any circumstances, especially while underway.  If an emergency had arisen, e.g. a fire inside "A" deck, the pathway to the deck above would have blocked an outside exit from upper decks. Secondly, the staging of bags in the net, while underway, would have created a tripping hazard, both during the operation, while bags were being carried from the other side of the ship and placed in the net, and after the operation with the passageway being blocked. That alone is good reason for staging them under the ladder. Thirdly, loading the net while underway would create a clear, foreseeable danger by requiring someone to operate the ship's crane while the vessel was in motion. Fourthly, the ship would not have created two discrete operations, if there had been time to do one operation.  It is crystal clear that it was the judgment of the ship's officers and bosun that, for the ship's safety, in order to prepare for mooring, two discrete operations had to be performed to get the garbage off the ship; the time to carry the bags to the garbage room took place well before mooring; and the time to load them into the net took place immediately after mooring.  Ships are not in the business of wasting time.  This Court should not risk creating a rule that would require ships to do the operation differently and perhaps create some dangerous situations.

Plaintiff has the burden of proof to show that the decision to perform two discrete operations was unreasonable.  But coming up with an arguably better way to do it does not meet that burden of proof.  Even if loading directly into the net could be reasonable, and could have physically been done before mooring preparations, it does not make unreasonable stacking the garbage bags out of the way on "A" deck for later placing in the cargo net.   The suggestion that

stacking itself creates an unsafe condition is untenable because stacking of garbage bags is done all the time, everywhere – in restaurants, apartment buildings, office buildings and even at home. A short walk in downtown Manhattan at night corroborates that proposition and such stacking has never been deemed to be unsafe.   Even stacking in the ship's garbage room occurred and there was no suggestion that it was unsafe.[1]  In fact, Mr. Soliman testified that space is limited on all containerships that he has sailed on, not just Maersk ships, and that the staging and stacking of garbage bags is practiced on all such containerships. (*Id.* at p. 197, l. 21-25; p. 198, 3-9)

There is no tenable argument that the ship could have disposed of the garbage bags at Algeciras in any other way than the method chosen and followed without incident on hundreds of occasions. Due to the configuration of the MAERSK IDAHO, the only two options for disposing garbage was to lower it to the pier using the ship's crane on "A" deck or to throw it from the stern mooring deck to a barge below.  (see Tr. at p. 170)  However, Plaintiff admitted at trial that the latter method was not a permissible option because it was prohibited at the Port of Algeciras.  (Tr. at p. 170, l. 19-21)  Thus, the only way to dispose of the ship's garbage was to lower it to the pier using the ship's crane on "A" deck.

---

[1]   Captain Stoller articulated certain risks of stacking, excludable because not mentioned in his report, and which have no relevance here, mainly arising out of potential protrusions:

"Q. Captain Stoller, do you believe with reasonable professional certainty the manner in which the bags were stacked under the ladder, against the bulkhead, had the height and width that you've already described as in accordance with proper standards of marine practice?
"A. No, I believe it is not.
"Q. And the reason why?
"A. When you stack them high, you negate the ability to tie ears on the bottom, so you don't have ears on the top and ears on the bottom, like the postal service picture, which might not be ears but caring from the top and the bottom. You also -- by stacking them up, they can get pierced by another bag and hold onto another bag, and you have to be able to overcome the friction when you're pulling with the hand."
Tr. at 264-65.

458772.1

Nor is stacking garbage bags 5 feet high, across which Plaintiff, for some reason, allegedly reached horizontally, unsafe[2]. (There is no evidence that he was pulling the bags over his head, as the Court intimated at Tr. 545).   As the crew did in the garbage rooms, if stacking was a problem, the bags could have pulled the bags onto the deck.  The bags were relatively light for seamen; the only evidence containing an estimate was 25 pounds.   Seamen are expected by Coast Guard rules to be able to lift at least 40 pounds.  No standard of height of stacking has been posited or proven.  There is no difference between stacking one foot high and five foot high.   There is no rule or regulation that seamen should not be able to reach for things horizontally; nor can there be; nothing would get done.   Stacking light bags is not unsafe; blocking passageways on a ship underway and risking unprepared mooring operations is unsafe.

The argument that stacking bags can be hazardous, because shards of glass can cause them to stick is unfounded, groundless, and devoid of evidentiary support. (See Tr. at 546).  There is absolutely no evidence that the bag was stuck.  It is sheer speculation[3].  The bags were

---

[2]   Plaintiff's testimony was not credible on this point. The undisputed evidence reflects that the bag was resting atop a stack of two or, at the most, three bags when Mr. Soliman grabbed it.   First Engineer Robert Neilson is the only witness in this case who was present with Mr. Soliman on "A" deck at the time of the subject accident.   (Neilson Dep. at p. 29, l. 5-13)  He testified during his deposition that the trash bags at issue were regular household trash bags and stated that some of them were stacked in piles two or three bags high.  (*Id.* at p. 32-33, l. 18-5; p. 36, l. 3-8; p. 130, l. 3-5)  This is consistent with the testimony of Mr. Soliman, who testified at trial and during his deposition that "[t]here were two bags, one on top of the other" and that the stack was approximately five feet high at the time of the incident.  (Tr. at p. 175-176).  Even the five foot estimation stretches the imagination.

[3]   Stoller testified:

"Q.      The next one, 'There are no sharp or protruding objects."Is that relevant to the situation?

"A.      It could be. It could be relevant. I don't know whether it had sharp objects or not.

Tr. at 243.

He also testified on cross examination:

458772.1

placed into the net after the injury with no further problem. A finding of Jones Act negligence resting on "speculation and conjecture" cannot stand. *New York Cent. R. Co. v. Ambrose*, 280 U.S. 486, 489-90 (U.S. 1930); *see also Chicago, M. & St. P. R. Co. v. Coogan*, 271 U.S. 472 (U.S. 1926) ("The record leaves this matter in the realm of speculation and conjecture. That is not enough.").

## II.   THERE WAS NO VIOLATION OF THE ISM OR ANY SAFETY MANAGEMENT SYSTEM RULE OR REGULATION.

During the trial, Captain Stoller, Plaintiff's maritime expert, offered two basic opinions with respect to the events in this matter[4]. Those opinions—which were recited with the Court's assistance—were that:

1. Maersk Line, Limited owners, managers and employees failed to conduct a Risk Assessment and a Job Safety Analysis for the handling and removal of garbage bags from the ship. Had they completed a JSA—which is a Job Safety Analysis—additional measures could have been taken to mitigate the risk of injury; and

2. Maersk Line, Limited's owners, managers and employees failed to follow industry standards for safe lifting practices. Their failures constitute breaches of the safe custom and practice of the maritime field. Their failures created the unsafe working conditions and were a substantial factor that led to Mr. Soliman's injury.

(Tr. at p. 220)

---

"Q. And also correct that there are no evidence -- there's no evidence in this case of any obstacles or protrusions from these bags that made this bag that was in connection with Mr. Soliman's injury stick or be unable to move?
A. There's no facts that that had happened. It doesn't mean that it didn't happen, but there's no actual fact that it happened."

Tr at 287.

[4]   Captain Stoller did not provide any particular expertise that would aid the Court as fact-finder in this matter; rather, he was used primarily (and improperly) as a sort of fact witness to rehash the circumstances of the subject accident. (See, e.g., Tr. at p. 222, l. 6-14; p. 225-226, l. 20-3)

458772.1

With respect to Captain Stoller's first opinion—that Maersk failed to conduct a job safety analysis for the routine task of garbage handling—it is painfully obvious he woefully failed to articulate a workable standard concerning when a job safety analysis must be completed. In this regard, his response to the Court's straightforward inquiry was entirely incomprehensible:

> THE COURT: So every single task has a risk assessment?
>
> THE WITNESS: Not every single one, but most of them should have a risk assessment. Not every single one. Making coffee is not going to have a risk assessment.
>
> …
>
> THE COURT: What is the industry standard on doing a risk assessment?
>
> THE WITNESS: The industry standard is to do risk assessment, to assess risk, because you want to prevent injury. You want a safe work environment. So when you get a task, you want to look at the task and see if the task can be done safely with how many people. Are there standards for the task? Is the task something that can be done with mechanical use or not? Even OSHA has publication, publication 3071. It's called Job Hazard Analysis. Even OSHA looks at risk assessment. So the standard in the industry is risk assessment for tasks.
>
> THE COURT: For every task?
>
> THE WITNESS: Majority of tasks, because it also says in there you must safeguard against unidentified risk, which is risk assessment. Well, there is a risk of trash bags and getting hurt.

(*Id.* at p. 263-264)

On cross-examination, Captain Stoller essentially contradicted himself by admitting that a JSA is not required for routine tasks. (*Id.* at p. 304) Nor should it go unnoticed that Captain Stoller's initial opinion that a risk assessment was required for the task of garbage handling was not shared by any other witness in this case. This includes Mr. Soliman, himself, who testified

6

that a job safety analysis was not needed for the routine task of garbage handling. (*Tr.* at p. 281) Mr. Soliman's view was shared by Captain Willers, who testified that a JSA was not needed because the task of garbage handling is not hazardous or dangerous. (*Id.* at p. 262) In addition, Maersk's own maritime expert, Captain Bergin, testified that a JSA was not required for the routine task of handling garbage. (*Id.* at p. 313)   Captain Stoller never even got to the point to explain how the performance of a JSA would have served to prevent the happening of the subject accident.

Captain Stoller's second opinion was that Maersk failed to follow industry standards for safe lifting practices.  His testimony on this issue largely centered around the ISM Code and Maersk's Safety Management System (i.e., its Global Safety Management System or GSMS). The regulations codifying the ISM Code set forth the following:

33 C.F.R. § 96.230 What Objectives Must a Safety Management System Meet?

The safety management system must:

> **(a)** Provide for safe practices in vessel operation and a safe work environment onboard the type of vessel the system is developed for;
>
> **(b)** Establish and implement safeguards against all identified risks;
>
> **(c)** Establish and implement actions to continuously improve safety management skills of personnel ashore and aboard vessels, including preparation for emergencies related to both safety and environmental protection; and
>
> **(d)** Ensure compliance with mandatory rules and regulations, *taking into account relevant national and international regulations, standards, codes and maritime industry guidelines, when developing procedures and policies for the safety management system.*

Both Captain Stoller and Captain Bergin testified that Maersk's GSMS was fully compliant. (Tr. at p. 285, 304-305)  Nevertheless, the import of Captain Stoller's opinion was that Maersk failed *to take into account* various guidelines concerning safe lifting practices, in

7

458772.1

violation of the ISM Code but did not provide any guidance as to the meaning, "take into account." The following testimony only muddied the waters:

> THE COURT: Well, for cases that fall under the ISM Code, you're drawing no distinction between mandatory rules and regulations and other things that should be taken into account.
>
> THE WITNESS: Just that it's worded different, but it's recommended that you use standards and take them into account. It might not be as forceful as the first one.

(*Id.* at p. 256)

In addition to the fact that Captain Stoller could not establish that Maersk's GSMS failed to satisfy a mandatory requirement, the courts in the Second Circuit have unequivocally ruled that 33 C.F.R. § 96.230 cannot form the basis for a holding of negligence *per se. See Johnson v. Horizon Lines, LLC*, 520 F.Supp.2d 524, 533 (S.D.N.Y. 2007); *see also Horton v. Maersk Line, Ltd.* 603 F. App'x 791 (11th Cir. 2015) (following *Johnson* and noting plaintiff "cannot rely on the [ISM] Code to support his negligence claim against Maersk").

Regardless of the fact that Captain Stoller's arguments concerning the ISM Code are a non-starter, he has woefully failed to establish that the various guidelines for safe lifting practices (such as those utilized by the United States Postal Service!) amount to an industry standard for the safe lifting of garbage bags by seamen on containerships in the maritime industry. The distinction between "industry standards" and common-sense "guidelines" is a legally significant one, as an expert's reliance on the latter is irrelevant and subject to exclusion. *See Reyes v. Delta Dallas Alpha Corp.*, 2000 U.S. Dist. LEXIS 5668 (S.D.N.Y. 2000) (excluding expert testimony where there was no evidence expert relied on anything more than common sense guidelines, as opposed to industry standards); *Grdinich v. Bradlees*, 187 F.R.D. 77, 81 (S.D.N.Y. 1999) ("In fact, nothing in [the expert's] deposition or expert report indicates that

8

industry standards for the display of merchandise actually exist, other than general common-sense guidelines, such as stacking heavy items on lower shelves. Without 'industry standards to rely upon, [the expert] seems to base his opinions on his own authority."); *see also Fulop v. Malev Hungarian Airlines*, 2003 U.S. Dist. LEXIS 53 (S.D.N.Y. 2003) (excluding testimony of expert pilot where he could not identify any industry standards concerning how a flight crew should react during an in-flight medical emergency).

Stoller sought to rely on the ABS Guidance Notes for Application of Ergonomics to Marine Systems and the American Society for Testing Materials as examples of recommended lifting limits. (Tr. p. 240) However, the ABS Guidance Notes are just that, Guidance Notes, not standards. In fact, Captain Stoller failed to establish that either of these reference materials are recognized industry standards in the maritime industry. Nevertheless, Captain Stoller's discussion of these guidelines was just bluster, anyway, as he ultimately conceded on cross-exam that neither the ABS Guidance Notes, nor the American Society for Testing Materials, prohibit (or even mention) one-handed pulling. (*Id.* at p. 283-284).

Captain Stoller read from a portion of the Maersk Safety manual which urged workers to lift bags at both corners and argued that Maersk should have supplied two eared garbage bags, but the Court's question disposed of that argument:

> "THE COURT: Was there anything preventing Mr. Soliman from this -- the day this happened from grabbing hold with both arms both hands onto the bag?
>
> THE WITNESS: The way he was –
>
> THE COURT: No. Anything preventing him? He testified to how he did it, but was there anything that you're aware of that prevented him from taking his two hands, grabbing a plastic -- I guess it is plastic garbage bag, whether there are ears or not, and pulling it and putting it into the net?

THE WITNESS: No."

Tr. at 249.

The absurdity of Captain Stoller's testimony culminates with no guidelines for

the activity in question:

> "Is there anything in this guidance note which provides any safe
> limits to perform pulling up operations when you're arm is
> extended laterally off to your side?
>
> A.  No.
>
> Q.  Are you aware in all of your years of studying the subject of
> material handling of any code, guidance, recommendation for --
> that acknowledges that a safe pulling with a lateral movement can
> be performed?
>
> A.  No."

Tr. at 259.

It is not surprising that Captain Stoller was precluded by Judge Preska from testifying

concerning the identical subject.  In summary, the opinions of Captain Stoller lack merit, fail to

demonstrate a violation of the Jones Act, and amount to nothing beyond a mere distraction.

### III.    GARBAGE BAGS ARE NOT WEIGHED.

Plaintiff's counsel argued at trial that the stacking and handling of garbage bags of

undetermined weight constitutes negligence.  There is no evidence that could raise the standard

of care to require the weighing of each individual trash bag in the garbage room prior to them

being transported to "A" deck for staging and disposal.  In fact, Plaintiff's own maritime expert,

Captain Stoller, failed to articulate any industry standard concerning the weighing of garbage

bags onboard container ships.    As demonstrated in the following exchange, Mr. Stoller was

unable to cite for the Court a single example of a shipping line that weighs its garbage bags:

> THE COURT: Let me ask you a quick question.  What percentage
> of the cargo fleet weighs their garbage bags?

10

THE WITNESS: What percent of them weighs it?

THE COURT: Yeah?

THE WITNESS: I don't know the percent that weighs it.  But as far as the lifting standards, I know that Exxon is very proactive in establishing weight limits on certain items.

THE COURT: But you don't know what percent of the overall cargo container outfit does it?

THE WITNESS: Correct.  Because they're not doing it doesn't make it right.

MR. WALSH: Do you know if anybody weighs the garbage bags? …
THE WITNESS: I would say if anyone does it, it would be Exxon.

MR. WALSH: You don't know that?

THE WITNESS: Not for sure.

(Tr. at p. 293-294)

Furthermore, the evidence presented at trial and through deposition testimony demonstrates that the weight of the bags was contemporaneously ascertained.  The Captain of the MAERSK IDAHO, Paul Willers, testified during his deposition that although the garbage bags are not weighed on a scale, their weight is nonetheless ascertained by virtue of the crewmembers, including Mr. Soliman, picking up the bags in the garbage room and moving them to "A" deck for staging.  (Willers Dep. at p. 50-51, l. 20-9).  If a crewmember lifted a bag and it was an unreasonable weight, he would ask for assistance.  (Plaintiff testified at trial that if he ever found something too heavy to lift, he did not have to lift it and could instead ask for help or obtain mechanical assistance.)  (Tr. at p. 150, l. 13-18)

Plaintiff was one of three crewmembers who moved the garbage bags from the trash room to "A" deck.  (*Id.* at p. 172, l. 2-7)  He carried one garbage bag at a time and did not

encounter a bag that was too heavy for him to lift, carry, or stack (*Id.* at l. 17-22; p. 173, l. 7-10)
Neither did the other crewmembers complain about lifting or stacking a heavy bag. (*Id.* at p.
173-174, l. 12-1)  Although the precise weight of each bag was not measured with a scale, the
procedure of moving the bags individually from the garbage room to "A" deck enabled the
crewmembers to ascertain the general weight of each bag and to determine whether it was
reasonable for one person to move and handle each bags.[5]

### IV.    THE GARBAGE WAS NOT COMPACTED.

Despite Plaintiff's counsel's attempt to present an inference at trial that the garbage bags
at issue were compacted (and therefore heavy), the evidence in the record strongly refutes this
theory.  Captain Willers made clear during his deposition that the trash compactor onboard the
vessel is only utilized to make more space when "the stowage in the garbage room starts to get
critical." (Willers Dep. at p. 169, l. 22-25)  He testified that normally it was not necessary to use
the compactor between Port Said and Algeciras during the return voyage from the Middle East.
(*Id.* at p. 172, l. 1-10)  In fact, when asked about the situation in the garbage room of the
MAERSK IDAHO during the return voyage from the Middle East in October of 2011, he
responded as follows:

> Generally, at some point, most all the garbage had been discharged
> at Port S [Said] East, so the garbage that was generated in that
> garbage room at this time would have been only generated in the
> five days from Port [Said] East to Algeciras in the Mediterranean.
> So the garbage would not be as voluminous as it would be going

---

[5]    It is noted that Plaintiff's counsel questioned Mr. Stoller about certain provisions of the Maersk Line
Limited Safety Handbook (Exhibit 93).  In particular, they discussed item 5.7 of the safe work procedures
for material handling which states "[w]hen lifting or handling always be sure to know the weight."
However, "knowing the weight" of something and "weighing" something is not mutually exclusive.  By
lifting each garbage bag and transporting them to "A" deck, Plaintiff and the other involved crewmembers
ascertained the general weight of the bags.  It is not practical, logical, or required for crewmembers to
weigh each individual object on the vessel before lifting it.

12

the other direction.  So I, at that point, would say that it was not a
very packed garbage room.

(*Id.* at p. 170, l. 1-12)

In addition, the eyewitness testimony of First Engineer Neilson directly supports the
conclusion that the garbage bags at issue had not been compacted prior to the subject accident.
He testified that generally the only type of trash bags that were used in the compactor were
heavy duty black bags.  (Neilson Dep. at p. 37, 2-8)  However, he testified that the color of the
bags that he and Mr. Soliman were placing into the cargo net at the time of the accident was
green, not black.  (*Id.* at p. 38, l. 6-18; p. 40, l. 8-10).

## V.     THE SHIP CANNOT BE MADE ACCIDENT FREE.

### A.   "Relaxed" Standard of Care Implicitly Overruled.

Seamen have a cause of action against their employer for negligence under the Jones Act,
which incorporates the Federal Employers Liability Act (FELA), 45 U.S.C. § 51, by reference.
46 U.S.C. § 30104. The Jones Act "places a duty on the shipowner to provide a reasonably safe
workplace. *Willis v. Amerada Hess Corp.*, 379 F.3d 32, 42 (2d Cir. 2004) .

Unlike the majority of Circuits that have addressed the issue,[6] the Second Circuit has
previously held that a relaxed standard of negligence applies to  FELA cases.  *Williams v. Long
Island R.R. Co.*, 196 F.3d 402, 406 (2d Cir. 1999); *Ulfik v. Metro-North Commuter R.R.*, 77 F.3d

---

[6]    The First, Third, Fourth, Fifth and Sixth Circuits apply a relaxed standard solely to causation, not
negligence, in Jones Act claims.  *See Garza v. Norfold S. Ry.*, 536 Fed. Appx. 517, 520 (6th Cir. 2013)
(the "relaxed standard under FELA does not affect plaintiff's obligation to prove the railroad was in fact
negligent"); *see also Van Gorder v. Grand Trunk W.R.R.*, 509 F. 3d 265, 269 (6th Cir. 2007); *Napier v.
F/V DEESIE*, 454 F.3d 61, 67 (1st Cir. 2006); *Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432,
437 (4th Cir. 1999); *Wilburn v. Maritrans GP, Inc.*, 139 F.3d 350, 357 (3d Cir. 1998); *Gautreaux v.
Scurlock Marine, Inc.*, 107 F.3d 331, 338 (5th Cir. 1997).

54, 58, fn. 1 (2d Cir. 1996) (noting the requirement of foreseeability was satisfied under either

the traditional common law definition or under the "purportedly relaxed standard for FELA").

　　*Williams* and *Ulfik*, however, are now on very unsure footing and the Court is not obliged

to follow that FELA precedent in this *Jones Act* case, because the U.S. Supreme Court has cast

significant doubt on the viability of *Williams* and *Ulfik*.  In *CSX Trans., Inc. v. McBride*, 131

S.Ct. 2630 (U.S. 2011),  the Court dictated the charge to be give to juries in FELA cases:

> FELA's language is straightforward: Railroads are made answerable in damages
> for an employee's 'injury or death resulting in whole or in part from [carrier]
> negligence.'... 'Reasonable foreseeability of harm,' we clarified in *Gallick*, is
> indeed 'an essential ingredient of FELA *negligence*.'  The jury, therefore, must be
> asked, initially:  *Did the carrier 'fail to observe that degree of care which people
> of ordinary prudence and sagacity would use under the same or similar
> circumstances?'  In that regard, the jury may be told that 'the railroad's duties
> are measured by what is reasonably foreseeable under like circumstances.'*  Thus,
> 'if a person has no reasonable ground to anticipate that a particular
> condition...would or might result in a mishap and injury, then the party is not
> required to do anything to correct the condition.'  If negligence is proved,
> however, and is shown to have '*played any part, even the slightest, in producing
> the injury*,' then the carrier is answerable in damages even if 'the extent of the
> injury or the manner in which it occurred' was not 'probable' or 'foreseeable.'

*Id.* at 2643 (citations omitted, emphasis added).   In unmistaken terms, the U.S. Supreme Court

has ordered the ordinary negligence standard to be charged in FELA cases.  No mention of a

relaxed standard of care was made. The "slight" or reduced standard was applied only to the

issue of causation.  The Second Circuit would tread dangerously if it ignored the directive from

the U.S. Supreme Court and would be on thin ice if it attempted to reconcile *Williams* and *Ulfik*

with *McBride* and it is highly unlikely that it will.   This Court can confidently apply *McBride*

with no concern for reversal. In fact, in a case familiar to this Court, the Second Circuit directed

that the *McBride* charge be given in full by the District Courts. *See Stowe v. Amtrak*, 481 Fed.

Appx. 701 (2d Cir. 2012).  There, the Second Circuit found that while the instructions submitted

by the lower court to the jury were not erroneous, "it would be preferable going forward for

458772.1

courts to use the language clearly approved in *McBride, id.* at 2635." The instructions approved

in *McBride* did not reference a relaxed standard for negligence, and restated the "ordinary care"

standard. *Id.* This Court should following the rule of the Supreme Court in *McBride*, which has

been subsequently adopted by the Second Circuit in *Stowe*, and adjudicate the Plaintiff's Jones

Act claim by applying the ordinary negligence standard confining the relaxed standard for

causation.[7] Because the ship used ordinary care when they stacked garbage bags out of the way

to ready them for placement in the cargo net, -- just as ordinary people do everywhere – and

because there was no obligation to weigh bags or to train someone who by his own testimony

knew his job more than others knew their job; and because he performed his job safely hundreds

of time as did others, and because the very happening of this accident does not infer that it was

caused by an unreasonable act or condition -- there is no showing of negligence by the plaintiff

## B.   Some Negligence has to be Proven.

The ship had no duty to be accident free. *Traupman v. American Dredging Co.*, 470 F.2d

736,737-38 (2d Cir. 1972) ("Absent a situation involving *res ipsa loquitur* mere proof that an

accident occurred is not evidence of anyone's negligence."); *see also New Orleans & N.E.R. Co.*

*v. Harris*, 247 U.S. 367, 371 (U.S. 1918) (plaintiff must affirmatively establish negligence which

"is essential to recovery").

Plaintiff must prove by a preponderance of the evidence that the defendant shipowner

had notice of the dangerous condition *and* should have reasonably anticipated the plaintiff might

be injured by it. *Diebold v. Moore McCormack Bulk Transport Lines, Inc.*, 805 F.2d 55, 58 (2d

Cir. 1986); *Quiles v. City of New York*, 978 F. Supp. 2d 374, 381 (S.D.N.Y. 2013); *Bailey v.*

*Seaboard Barge Corp.*, 385 F. Supp. 2d 310 (S.D.N.Y. 2005); *Havens v. F/T Polar Mist,* 996

---

[7]   It is questionable what the Second Circuit meant by a relaxed standard in any event.  Did it mean that there was a higher standard of care than ordinary negligence?  If so, what is the standard?

F.2d 215, 218 (9th Cir. 1993); *see also Johnson v. Arctic Storm, Inc.*, 99 Fed. Appx. 799 (9th Cir. 2004) (affirming trial court's holding that "grease on the ladder was a temporary circumstance caused by [plaintiff] himself" and that "the law does not impose a duty to warn of an obvious danger"). A seaman cannot recover under the Jones Act where he was not injured by a reasonably anticipated dangerous condition. *Bailey*, 385 F. Supp. 2d at 316. In *Bailey,* the defendant shipowner obtained summary judgment where it could not have anticipated plaintiff would incur injury while taking a circuitous path to board its barge, even where plaintiff believed the primary means of ingress to the barge was unsafe due to the welding work being performed in that area.

Plaintiff testified that he and two other crewmembers moved all of the bags from the garbage room to "A" deck. He further testified that he had placed approximately 15 bags in the cargo net from the stacks before suffering the subject accident. Notably, Mr. Soliman further testified that he had completed this routine task of stacking garbage bags and placing them into a cargo net numerous times in the past, both while aboard the MAERSK IDAHO as well as other containerships. The manner in which this task was completed by Mr. Soliman and other crewmembers during the numerous prior occasions was no different from the manner in which the task was completed at the time Mr. Soliman suffered the subject injury.

There was no evidence presented at trial which could lead this Court to conclude that Maersk reasonably could have anticipated Mr. Soliman being injured from an innocuous stack of garbage bags while completing the routine task of placing the garbage bags into a net. Plaintiff has failed to prove that the garbage bag that caused his injury was in any way unique, let alone particularly dangerous or unsafe.

458772.1

Essentially, there was no risk that could be identified. Captain Larry Bergin testified that one of Maersk's obligations under its Safety Management System ("SMS") is to identify risks. (Tr. p. 301-302)  He explained that commonsense as well as the experience of the ship's officers is used to identify risks.  (*Id.*)   If there has been no previous injury associated with a particular activity then that activity does not have to be identified as a known risk.  (*Id.* at p. 303, l. 8-11)  There is no evidence in the record that the routine task of garbage disposal—performed in the same manner in which it was performed in this matter—was ever the cause of personal injury to a seaman.

While the manner of injury need not be foreseen, there has to be some reasonable connection between the foreseeable risk and the consequence.  One does not look at a stack of garbage bags and worry about rotator cuffs or about a seamen reaching shoulder high for a 25 pound bag. The type of injury incurred by Mr. Soliman—a torn rotator cuff—is simply not a foreseeable consequence of stacking garbage bags.  Plaintiff was required to "present probative facts from which negligence and the causal relation could reasonably be inferred." *Tennant v. Peoria & P.U. R. Co.*, 321 U.S. 29, 32 (U.S. 1944).

 In fact, even gravity-related injuries caused by the stacking of items or cargo onboard a vessel does not necessarily demonstrate negligence on the part of the shipowner. *See La Fleur v. M.S. Maule*, 349 F. Supp. 1318 (W.D. La. 1972) (granting judgment for the defendant, finding any negligence inferred from the mere falling of a stack would be "instantaneous").

### C. Proximate Causation is the Substantial Factor Standard in Unseaworthiness Cases.

Seamen have a cause of action against the vessel on which they are employed, *in rem*, and her owner, *in personam*, under the general maritime law for unseaworthiness. *See Mitchell*

*v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (U.S. 1960).   To prevail on a claim for unseaworthiness, plaintiff must prove that a vessel was defectively or insufficiently equipped, such that "unseaworthiness played a *substantial part* in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Lisowski v. Reinauer Transp. Co.*, 2009 U.S. Dist. LEXIS 23429, at * 38-39 (E.D.NN.Y. 2009) (emphasis added).   The vessel need not be perfect, but reasonably suited for her intended service. *Mitchell*, 362 U.S. at 550; *see also Oxley v. City of New York*, 923 F.2d 22, 24 (2d Cir. 1991).   To satisfy the warranty of seaworthiness, a shipowner is not required to furnish the best possible ship, gear, or equipment, but must simply furnish a ship, gear and equipment which is reasonably fit and suitable for its intended purpose. *See Morton v. Berman Enterp., Inc.*, 669 F.2d 89, 91 (2d Cir. 1982).   Where a plaintiff fails to prove by a preponderance of the evidence that a certain task required more crew than were assigned, the vessel is not unseaworthy. *Reyes v. Delta Dallas Alpha Corp.*, 199 F.3d 626, 630 (2d Cir. 1999); *Anderson v. Great Lakes Dredge & Dock, Co.*, 509 F.2d 1119, 1120-21 (2d Cir. 1974).   The standard of causation for unseaworthiness is more demanding than that for a Jones Act claim. *Sadler v. Moran Towing Corp.*, 204 F. Supp. 2d 695, 697 (S.D.N.Y. 2002); *Nasser v. CSX Lines, LLC*, 1991 F. Supp. 2d 307, 315 (E.D.N.Y. 2002).

That standard has not been met here. There is no connection between a stack of garbage bags and a torn rotator cuff.   Stacking garbage bags did not cause any abnormal reaching which does not occur in everyday life.   This injury was a culmination of wear and tear – borne out by his longtime occupation and the diagnostic imaging—which naturally progressed to a point where he could no longer function.   Reaching was the straw that broke the camel's back and it could have happened while he was reaching for mooring lines, fire hoses, paint cans, lashing

rods, turnbuckles and any other equipment found on a container ship.  Plaintiff has been sailing as an able bodied seaman for over 40 years doing nothing but manual labor, including heavy lifts over his head and repairs aloft in bosun chairs. Able-bodied seaman, such as Mr. Soliman, are required to satisfy various physical guidelines imposed by the Coast Guard to obtain a merchant marine certification.  (Tr. p. 282, l. 6-14)  The Coast Guard requires that seamen demonstrate the ability to lift a 40 pound load and to lift, pull or carry the same load.  (*Id.* at l. 15-24)  Seamen must, at minimum, be able to carry an uncharged one and-a-half inch diameter fire hose 50 feet, as well as a 1.5 inch charged fire hose to fire fighting position. (*Id.* at p. 283, l. 1-16)

Plaintiff himself, testified that the physical duties required of him working aboard Maersk ships paled in comparison to the more arduous duties required aboard Egyptian ships, of which he sailed on for approximately 18 years.  (Tr. at p. 148, l. 19-25; p. 44, l. 16-18)  For instance, the ropes and lines that he handled on the Egyptian ships were much heavier than those he handled on the Maersk ships.  In Mr. Soliman's words, "[e]verything is easier now."  (*Id.* at p. 149, l. 1-5)  With respect to the subject routine task of handling and disposing of garbage bags, Mr. Soliman testified that he had completed it in the same manner without incident numerous times in the past, both on Maersk ships and other containerships.  (See *Id.* at p. 197-198).

His arm was not pulled out of the socket, which was the hazard posed by the Court. Tr. at 545.  That is a different injury, which is a separated shoulder, known as a torn labrum.  The injury here was a tear in the rotator cuff which is mainly caused by wear and tear and is seen athletically in baseball pitchers whose acromion wears on the rotator cuff due to high velocity over handed throwing, (see Tr. at 381) and in football players who land awkwardly on their shoulder with a traumatic compression of the acromion onto the rotator cuff. It commonly occurs otherwise in aging persons, when acromial spurs come frequently in contact with the rotator cuff

tendons. As Dr. Cuomo acknowledged, a substantial portion of autopsies of persons over the age of 60 reveal unrepaired rotator cuff tears. Tr. at 380.

She also recognized that rotator cuff tears were often in both arms, which is consistent with Plaintiff having had left shoulder issues. Tr. at 380.

Dr. Cuomo also acknowledged that there was an "irregularity" in the acromion directly above Plaintiff's rotator cuff. That "irregularity" was caused by the humerus (arm bone) which sits below (and is the insertion for) the rotator cuff. Tr. at 384. The medical profession refers to it as a "high riding humerus" as a result of an already compromised torn rotator cuff being unable to stop the humerus and rotator cuff from going upwards together and rubbing up against the acromion repeatedly. Moreover, it is clear that there was little room for Plaintiff's humerus to avoid contact with the acromion, because the space between them was narrowed by the conceded acromial spur projecting downward. Dr. Cuomo also acknowledged wear and tear in the subscapularis tendon. Tr. at 389. Dr. Toriello's reading of the MRI correctly finds that the humerus was not sitting correctly in the glenoid and Dr. Cuomo's agreement as to the "irregularity" corroborates Dr. Toriello's opinion.

## VI.     PLAINTIFF WAS CONTRIBUTORILY NEGLIGENT.

Although contributory negligence does not bar recovery in Jones Act cases, it diminishes damages on the basis of comparative negligence in proportion to the amount of negligence attributable to contributory fault. *See Johannessen v. Gulf Trading & Transp. Co.*, 633 F.2d 653 (2d Cir. 1980). The facts and circumstances leading to Plaintiff's injury strongly indicate that any negligence on the part of Maersk was extremely minimal and that Plaintiff is largely responsible for his own injury. Mr. Soliman presented at trial as an extremely capable and

458772.1

experienced seaman. However, his attitude toward safety was that he had more experience than the ship's officers and that his knowledge was beyond reproach.

As revealed at trial, in 2010 Maersk sponsored a training seminar at Piney Point Maryland entitled, Safety in Motion, and invited Mr. Soliman to attend. (Tr. p. 180, l. 10-14; p. 307-308) Captain Bergin noted that it was highly unusual—yet extremely positive—for a shipping company like Maersk to invite a crewmember (rather than just vessel officers) to this type of training program. (*Id.* at p. 308, l. 4-14) Although Mr. Soliman initially registered for the course, he later cancelled, in part because he did not believe he needed the training. (*Id.* at p. 180-181) Mr. Soliman was asked during trial that if the seminar had taught him how to position his elbows closer to his body, whether that would have assisted him in preventing his injury. Mr. Soliman responded, somewhat indignantly, that he already "knew all of that," questioned how such a training seminar could help him, and concluded that "I know a lot about safety. I don't need to go to that and somebody tells me that again." (*Id.* at p. 181) As the saying goes, *you can bring a horse to water, but you can't make it drink.* The Court should find considerable contributory negligence on the part of Mr. Soliman based on the fact that that Maersk made deliberate efforts—well above and beyond those customary in the shipping industry—to train Mr. Soliman in the area of proper lifting and handling techniques and Mr. Soliman elected not to attend such training.

The facts and circumstances leading up to Mr. Soliman's injury also exhibit considerable contributory negligence on the part of Mr. Soliman. Despite the fact that Mr. Soliman was examined by a shoreside doctor who found he had osteoarthritic changes in his cervical and shoulder region and prescribed Mr. Soliman pain medication, Mr. Soliman decided to return to the ship and work "immediately," without paying attention to his injury. (*Id.* at p. 154; Ex. H) It

21

can be reasonably inferred that Mr. Soliman's left shoulder was still bothering him at the time of the subject injury, which led him to over-exerting his right shoulder during the garbage operations. By neglecting to take proper care of his body and/or advising Captain Willers of the potential physical restrictions caused by his October 14, 2011 injury, Mr. Soliman was contributorily negligent.

It is interesting to note that Soliman claims that he saw the doctor for his left shoulder under protest and at the insistence of the Master; yet, the physician ashore found significant problems with his left shoulder. This perhaps gives some insight into how plaintiff dealt with symptoms of injury. Even though the left shoulder was symptomatic, he refused to see a doctor. How many times did he fail to report problems with his right shoulder?

Finally, the evidence presented at trial demonstrated that nothing prevented Mr. Soliman from grabbing and pulling each trash bag with two hands, rather than one, which would have lessened the pressure on his right shoulder, likely preventing the subject accident. Plaintiff's maritime expert, Captain Stoller, conceded at trial that there was nothing inherent about the garbage operations on the MAERSK IDAHO that would have prevented Mr. Soliman from grabbing the garbage bags with two hands. (*Id.* at p. 249, l. 7-17) Finally, at no point did Mr. Soliman contend that it would be impossible for him to complete the subject task using two hands. (*Id.* at p. 74, l. 17-22)

## VII.   A FUTURE PAIN AND SUFFERING AWARD OF $500,000.00 WOULD BE EXCESSIVE IN LIGHT OF PLAINTIFF'S TESTIMONY AND LIFE EXPECTANCY.

A potential award of $500,000.00 for future pain and suffering is excessive under the facts and circumstances of this matter. The testimony uncovered at trial strongly indicates that

22

the bulk of the pain and suffering that Mr. Soliman is to endure—including the three failed shoulder surgeries—occurred before the trial.  In fact, there was strikingly limited testimony concerning whether Mr. Soliman currently experiences pain in his shoulder on a daily basis. While Mr. Soliman testified that he regularly takes medication, none of those medications are painkillers for his shoulder injury.  (Tr. at p. 144, l. 7-17)  The medications that he does take are related to his high blood pressure and heart condition.  (*Id.*)  Moreover, while Mr. Soliman previously underwent physical therapy for his shoulder, that therapy only lasted one year after his last surgery and ended in 2015.  (*Id.* at p. 109)  There is no indication that Mr. Soliman has plans to return to physical therapy.  In addition, one of Mr. Soliman's treating surgeons, Dr. Cuomo, testified that his best option for pain relief would be a total shoulder replacement.  (*Id.* at p. 362, l. 11-14)  However, Mr. Soliman declined to pursue this option.

Mr. Soliman is currently 66 years old and has a life expectancy of 81 years.  (Tr. at p. 43, l. 4; p. 409, l. 17)  Thus, a prospective award for future pain and suffering of $500,000.00 would equate to an annual award of $33,333.33 for the remainder of Mr. Soliman's life.  This figure is flatly excessive in light of the fact that Mr. Soliman would, presumably, already be compensated for his economic loss and his past pain and suffering, especially where he currently takes no regular pain medication and does not participate in physical therapy.  An annual award of $33,333.33 would constitute nearly two-thirds of Mr. Soliman's average annual earnings and, therefore, should be deemed excessive.  Finally, any award for future pain and suffering under the Jones Act must be discounted to present value.  *See Avecillas v. Ronback Marine Contr. Corp.*, 2015 U.S. Dist. LEXIS 89181 at *12 (E.D.N.Y. 2015).

**VIII.   PLAINTIFF SHOULD NOT BE AWARDED PAIN AND SUFFERING DUE TO HIS FAILURE TO MITIGATE.**

After Plaintiff had completed his physical therapy, Dr. Cuomo advised essentially that he had reached maximum medical improvement, and that the remaining step, to alleviate the pain, was to undergo shoulder replacement.  Dr. Cuomo pointed out that while shoulder replacement did not restore 100% functionality, it did alleviate the pain.  Plaintiff has a duty to mitigate his pain and should not be awarded pain and suffering to the extent that shoulder surgery would alleviate the pain and suffering.  Hence, the future pain and suffering should be much less than the $500,000 proposed by the Court.

Dated:   New York, New York
         November 14, 2016

Respectfully submitted,
FREEHILL HOGAN & MAHAR LLP
*Attorneys for Defendant Maersk Line Limited*

By: _____
    John J. Walsh
    80 Pine Street, 25th Floor
    New York, New York 10005-1759
    Telephone:  (212) 425-1900
    Facsimile:  (212) 425-1901

TO:   Ralph J. Mellusi, Esq.
      Tabak, Mellusi & Shisha
      Attorney for Plaintiff
      29 Broadway
      New York, New York  10006

24