**United States District Court**
**Eastern District of New York**

-----------------------------------------------------------------x
Mohamed Soliman

                      Plaintiff                 14-cv-5951 (DLI)

                                                                   Plaintiffs Post Trial Responses

against

Maerks Lines Limited and the vessel M.V.
Maersk Idaho, Official No. 1217920, her
engines, tackle gear, cargo and appurtenances,
etc. in Rem
                      Defendants.
-----------------------------------------------------------------x

Response to Defendants Arguments

**Defts Brief p. 1**

The Use of "A" deck for staging the garbage bags was reasonable

**(1)** The argument that this was a routine job plaintiff did numerous times not only on this ship but others, that he was not aware of any deficiency in the vessel, or what caused his injuries (other than a bag not moving) is totally inadequate as a basis to support the claim that A deck was a reasonable staging area manner or that the methods used for material handling were reasonable and safe. Same too in regard to opinions of Captain Willers etc. that the custom and practice aboard the Maersk Idaho makes the case for what is proper and reasonable. Custom and Practice does not set a standard.

Tug Ocean Prince, Inc. . v. U.S.584 F.2d 1151 (2nd Cir. 1978)

"The rule which has been supported generally by most of the authorities is that conformity to custom is not in itself the exercise of due care. Custom and usage do not justify negligence. A party cannot by his own continued negligence establish a custom by which he is exempt from liability; nor is legal responsibility for negligence mitigated by the fact that others had also been negligent. Methods employed in any trade, business or profession, however long continued, cannot avail to establish as safe in law that which is dangerous in fact. See Annot., 77 A.L.R.2d 1327 (1961).

In The **T. J. Hooper**, 60 F.2d 737, 740 (2d Cir. 1932), Judge Learned Hand said:
Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices.It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission. (Citations omitted).

In Troupe v. Chicago, Duluth & Georgian Bay Transit Co., 234 F.2d 253, 260 (2d Cir. 1956), Judge Waterman, in an action predicated upon negligence under the Jones Act for unseaworthiness under the general maritime law, stated:
* * * While the customary practice of the industry is relevant and admissible, the defendant's standard of care in a negligence action is not limited to complying *1157 with usual practices in the industry or trade."

### Defts Brief p. 2
The defense of that alternative methods were not practical or feasible

**(2)** Plaintiff's suggestion of pre-loading a cargo net, is a feasible alternative. Defendant's argument that it should be rejected as a "late arrival" first time presentation at trial, is trivial. The assertion that a plausible safe alternative must be filtered and "ratified" through an expert such as Stoller, is not required in case such as this. This court can decide all such issues without the need of expert testimony. On facts considerably more complicated this, the U.S. Supreme court reversed the Second Circuit and held that a jury was competent to decide the factual issues that on their face would appear to require a Naval Architect.

Salem v. U.S. Line Co. 370 U.S. 31, 82 S.Ct. 1119

The only issue before us on this phase of the case is whether the trial judge erred in instructing the jury that they might find the respondent liable for unseaworthiness or negligence for having failed to provide 'railings or other safety devices' at the crow's-nest platform. The Court of Appeals held that it was error to submit that question to the jury because 'There was no expert testimony that proper marine architecture required the additional provision of railings or **1122 other safety devices on such a ladder or platform enclosed within a tower leading to a crow's nest. Should the jury, under these conditions, have been permitted to decide whether proper marine architecture required railings or other safety devices? .....

This is not one of the rare causes of action in which the law predicates recovery upon expert testimony. See Wigmore, Evidence (od ed. 1940), ss 2090, 2090a. Rather, the

2

general rule is as stated by Mr. Justice Van Devanter, when circuit judge, that expert testimony not only is unnecessary but indeed may properly be excluded in the discretion of the trial judge 'if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation * * *.' United States Smelting Co. v. Parry, 10 Cir., 166 F. 407, 411, 415. Furthermore, the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous. Spring Co. v. Edgar, 99 U.S. 645, 658, 25 L.Ed. 487.

Accordingly, this court should have no hesitancy in rejecting all of defendants contentions as to non-feasibility of alternate methods based on the absence of any expert support.

**(3)** Plaintiff's suggestion is not the only alternative. There was no reason offered as to why a barge could not have been brought alongside as was done in Port Said. Captain Willers testified that in Port Said garbage was discharged into a boat that came alongside (Depo. p.121) he also admitted that when garbage was handled by this method that it also included garbage from the garbage room and that it was easier than taking garbage from the garbage room to starboard A deck as it would all be in one place to be lowered to a boat, (123). He also confirmed that the area back there is a "large area" (125). Defendant never elicited any testimony from Willers or anyone else that the method used in Port Said i.e. hiring a boat to come alongside was impractical, not feasible or for any reason could not be used in Algeciras.[1]

The sole support for the contention that the open boat method could not be used in Algeciras is plaintiff's testimony, defendant's brief pg .3. That is a totally inadequate basis on which to make this claim. The plaintiff, an able bodied seaman with limited experience on this vessel is not the "go to person - to answer this question. Moreover defendant reads way too much into plaintiff's answer. (Tr. at p. 170 L 19-21)

Q. Because in Algeciras, you can't throw the garbage off the stern mooring deck can you?

A. No, no.

Plaintiff's answer means nothing more than throwing garbage off the stern without a boat present is prohibited.

---

[1] the boat was described as about 35 feet long with a large half the deck and forward deck that's opened allowing you to put anything in there that could be carried 55 gallon drums, stores and then garbage (124)

3

In further regard to the subject of viable alternatives, another option is the following.[2]

Instead of pre-staging the garbage prior to arrival to save valuable time as defendant points out was essential, the garbage could have been brought from the garbage room to A deck <u>following</u> the work of docking. More particularly;

-garbage is carried up from the garbage room, and placed directly into the net.

-when full, the net is raised and lowered to the pier, emptied and retrieved.

-the process is repeated until completion. While the net is being worked, bags coming up from below - waiting in line so to speak - could be positioned in the 6 by 3 area but not stacked or bunched together.

**Defendant brief. Pg. 4**

(4) This amounts to a scattergun recitation of disconnected facts, i.e. Coast Guard expectations of "lifting 40 lbs", the absence of rules prohibiting "horizontal reaching", inconsistencies as to the height of the stack, comparisons between lifting one foot vs. five feet, speculation that the bag was stuck; are nothing more than ramblings. As for the plaintiff's credibility, the court obviously assessed it and presumably like Captain Willers found him to be truthful and honest.

**Defendant brief P. 5**

There was no violation of the ISM or any safety management system rule or regulation

(5) Whether to do a risk assessment or not, that is the question. Contention is made that Stoeller "woefully failed to articulate a workable standard". On the most basic level, the standard of care which Defendant was required to follow arises under General Maritime Law which impose the duty to inspect the work place, to provide a safe place to work, to identify and guard against foreseeable risks, see Plaintiff Brief, p. 28. Concomitant with the GML and the ISM Code and implementing CFRs, is the acknowledgment that " improper lifting techniques are a major cause of injury." Plaintiffs Brief p. 17. The decision to hire Safety in Motion consultant to teach safe work procedures for "material handling" ratchets up "actual notice" of this workplace problem. In addition are the definitions found in the Global Ship Safety Management System, Plaintiff's Brief page 26. The word "risk" appears as is defined as a component of six different phrases.

---

[2] This was not presented during trial but became apparent during the drafting of this Response to Defendant's brief.

4

Additional guidance is also found in the definitions of "hazardous situation" and "shipboard operations" see paragraph 74 plaintiff's brief.

If we begin with the premise that there is a major risk of musculoskeletal injuries in performance of material handling tasks, it become patently clear that routine garbage handling is an activity or scenario that needs to undergo "analysis", and "assessment" to reduce the likelihood and consequences of an event" causing injury. The Maersk Pocket Safety Book, brings it down to a level that any layperson can understand.

>     -have you identified potential risks and preventative measures?
>     -Have you identified "what if" situations which could cause potential risk?
>     -Have you overlooked or forgotten anything of importance?

Can anyone read this and conclude as Willers did that risk assessment does not apply to garbage handling because it is not hazardous or dangerous? Really! Handling garbage, handling ship stores, handling ship supplies are probably the primary activities in which crew are physically lifting, moving and handling objects. All are routine.

One has to do serious mental gymnastics to conclude that a material handling job involving disposal of garbage is outside the purview of a risk analysis and risk assessment and that ship masters who have a very heavy responsibilities for safety can discharge their awesome responsibility by ignoring such routing material handling tasks. See plaintiff's brief, paragraph 79 as to the masters responsibilities.

## Deft Brief Pg. 7-10

(6) Defendant's attempt to deflate the Industry Standards and Guidelines goes nowhere. The applicable standards were identified by Stoeller, Plaintiff's brief paragraph 62 and 63. Repeatedly the argument is made as to the absence of a specific prohibition concerning one handed horizontal or sideway pulling.[3] The contention is made that if no prohibition exists, one can conclude it is safe to use that technique. This pseudo argument was made in support of defendant's motion for summary and dismissed by the court. See Proceedings P. 544-546

If defendant is looking for an applicable standard it should start with the Safety in Motion conference - a standard to which it seeks to hold Plaintiff accountable but not itself. See plaintiff's brief paragraph 57.

## Defts Brief Pg. 10

---

[3] More accurately "abduction" as per Cuomo Tr. p. 373

Garbage bags are not weighed

**(7)** The question as to whether there is an industry standard for weighing garbage is too broad and not relevant. If this question is to have any relevance it needs to be considered in context of how garbage is handled and in context of recognized principles of material handling. If one begins with the recognition that lifting or handling an object without knowing its weight is unsafe, the presence or absence of an industry standard is irrelevant as to particular item or commodity.

Maersk recognizes the potential of injury if a seaman attempts to lift or handle an object of any description of unknown weight. The Pocket Safety Guide cautions, "when lifting or handling always be sure to know the weight" [4] (see plaintiff's brief paragraph 66). The fact that there is no specific rule or mandate that garbage bags "per se" should be weighted is a "red herring". The safe work procedure applies regardless of what is being lifted or handled, garbage, stores, pipes, equipment, tool boxes, etc.

Can Maersk dispense with its own safe work rule of always knowing the weight of an object lifted or handled, when dealing with the routing task of handling garbage? Clearly not. In this case, Maersk violated its own work rule.

**Defts Brief Pg. 12**

The Garbage Was Not Compacted

**(8)** The evidence presented does not clearly answer the question as to whether all or some, or none of the garbage was compacted. As defendant points out, Willers testified as to space saving as the reason for compacting and the fact that during the five days from Port Said to Algeciras the amount would not be as voluminous as going the other direction. Willers was aware that only heavy duty bags were used for compacting, Depo P 68 L 20-25, P 124 L23-25. Willers also believed the garbage coming from the ships house arrived in "paper bags" which were transferred into 30 gal plastic bags. Willers however had never witnessed compacting. Depo. 128

Neilson stated that in the garbage room, heavy duty black bags were normally used for compacting in the garbage room. (Depo. p. 37 L 5-15) He did say - at one point - that he saw green bags. (P.38 L 12) He went on to say in next few lines that they all looked green because it was getting dark out and because they were double bagged. But when pressed as to the rationale to double bag when heavy duty bags are available he

---

[4] "handling" indicates movements other than "lifting" i.e. pulling or pushing. This same caution about knowing the weight before lifting or handling is in every discussion of material handling safe work procedures.

6

concluded by say that he had no recollection as to whether some were green or black. (P.39-40)

Warwick recalled the color of the bags at this particular time as being black, (Dep. p. 52) but that sometimes green colored bags are used. Explaining the difference, he said that green bags are used as liners for pails around the ship which are then taken to the garbage room

Plaintiff stated he was not involved in an compacting process between Port Said and Algercis, but he did assist in carrying the bags to A deck He stated crew members put their individual garbage in a plastic bag which is brought to the garbage room and compacted. Tr. 169 L 17-20

JE Exh 35 depicts a heavy duty black garbage bag which plaintiff identified as the type which was on A deck at the time in question. Tr. p.54

It is also significant that the photo of the bosun shown in JE 1-Tab 3 has him carrying a heavy duty black garbage the bag to the cargo net. This was intended to be a reenactment depicting the type of bag and position of the cargo net at the time in question.

Willers mention space saving in garbage room was the reason for compacting. If so, compacting would also have facilitated the small space available on the A deck staging area and additionally reduced the amount of trips needed to carry the bags, and in addition, putting extra money in the bosun's pocket for paid penalty time to compact. Soliman Tr. 163-164

More importantly, and whether or not compacting was done, defendant maintains that all the bags - including the culprit bag causing injury - were uniformly about 25 lbs. Defendant also maintains this is a light bag for the type of work being done. The reality is that 25 lbs placed the plaintiff at risk even in the absence of any factors which could have prevented it from moving freely from the stack. The ABS Guidelines, sets a limit for an ideal one handed "lift" directly off the floor, at 22.5 lbs. (Plaintiffs brief at paragraph 71.) There are no safe limits for the type of pulling performed at the time of injury. What is known is that shoulder abduction is the most vulnerable postion to position the arm, because it puts the most strain on the rotator cuff, Cuomo (Tr. p. 373)

**Defendant Brief P. 21**

Contributory Negligence

**(9)** Much is made about the Safety in Motion Seminar and the fact that plaintiff for reasons explained, did not attend. The law as to contributory negligence does not accompany plaintiff off vessel while on vacation and not in the service of the vessel. So too are the limits of a shipowners Jones Act /Unseaworthy obligation. Notwithstanding, Plaintiff provided a rational explanation and would have gone had he not been mislead as to the substance of the seminar.[5]

Apart from the irrelevant connection with contributory negligence, defendant points to only one technique or aspect of material handling, culled from the conference;  i.e. *to position one's elbows closer to the body*, which the plaintiff said he already "knew all of that". But where does this contention go? Is the argument being made that each and every bag could have been removed from the stack with elbows close to the body? How does one reach outwards whether in front of the body or sideways or up at an angle and simultaneously keep elbows close to the body? Plaintiff did not state he ignored this handling mode when it was practical to have used it.

The more important question is why Willers and his officers did not implement the training and instruction presented at the conference. The ISM and General maritime law obligations to "inspect the work place"  to "identify and guard against foreseeable risks" and to use proper safe work procedures were on their shoulders not plaintiff's.

There are an abundance of safe work references which were discussed at trial in addition to defendants in-house Pocket Safety guide, see Plaintiff's brief pg. paragraph 62. Willers, and his officers ignored each and every one in allowing garbage to be compacted, transported, staged, stacked, moved and handled, in the manner described at trial. Most glaring, the technique of handling "bags and sacks" . Willers and his officers ignored not only statutory and GML duties but Maersk's statement of job responsibilities.  This was continuous state of affairs and must account for all or the vast majority of the liability.

The plaintiff on the other hand used the most practical technique to move bags from a confined, stacked configuration. He was doing what he has done in the past and what he had seen others do, which Willers, Neilsen and Warwick agreed was customary. No one performed a studied execution of each bag. Rather it is a series of continuous

---

[5] One wonders why the plaintiff's immediate superior, the bosun was not invited or why he did not attend. He was person with direct day to day supervision over the Able bodied seamen.

movements, not exactly repeated, but adjusted to reflect changes in height, length and width of the diminishing stack.

### The Hustle and Bustle of Port Time

Also and highly important is the fact that the work was done in a port which had a 16 hour turn around to compete all business. Willers in fact testified on time restraints in his deposition at P.9 L23-25, P. 10-12. As seen the vessel had only 16 hours to arrive, conduct cargo operations, loading fuel (bunkers), discharging slops, taking on stores and completing all business.

Defendant is absolutely correct in stating on p. 2 of its brief that:

**"ships are not in the business or wasting time"**,

**"the ship would not have created two discrete operations if there had been time to do one operation."**

That admission speaks volumes as to how the men were expected to perform their assignments. Seaman would be expected to jump to orders, executing them smartly and quickly. Port time is no place for lollygaging. It is obvious that the method which moves the bags quickly, efficiently and with economy of movement is the one handed pulling, lifting, tossing maneuver which was customarily used and approved from Willers on down. More importantly, each bag movement was being done with the expectation - carried by all - that each would pull freely with one arm. Plaintiff was not anticipating danger or risk. Neither were Neilson nor Warwick.

It is in this context that the Court needs to assess contributory negligence.

### Pain and Suffering

**(10)** Following the injury on the vessel he came under the care of Dr. Boris Tsatskis during the approximate period, Oct. 27th, 2011 to April 2012. Treatment included physical therapy 3x per week, until the surgery of Feb. 12th, 2012 and continued therapy following surgery to April 2012

The initial MRI OF 11/1/11 (JE 44 at 367) showed;
-complete, full thickness, tear of the supraspinatus tendon with significant retraction.
-complete, full thickness tear of the infraspinatus tendon,
-moderate to large sized joint effusion,

-moderate amount of fluid interposed between the posterior deltoid muscle and the infraspinatus-teres minor muscles.

Dr. Dyan's surgical report of Feb 14th, 2012 ( *id* at 357) described the injury as follows: "from this vantage point, we noted a large full thickness tear, in fact a massive full thickness tear of the rotator cuff."

Following a period of no activity to maximize healing physical therapy resumed underDr. Dyan's care at One-on-One physical therapy commencing September 24, 2012, (JE46 p. 0010). Pain scale readings in these records varied from a low of six to a high of 10. Difficulties with activities of daily living range from 7 to 10 ( *id* at 0009)

In November 2012 it became apparent to Dr. Dyan that therapy was not going well. Soliman was complaining of weakness and difficulty lifting his right arm. Physical therapy notes from the initial evaluation to Oct. 31st 2012 reported on a regular basis complaints of pain and severe weakness in the right shoulder and arm ( *id* at 0012 to 0040). This was nine months after the initial surgery.

Dr. Dyan ordered a second MRI which was done November 7, 2012, which was read as a suspected re-tear of the rotator cuff. (JE 44 at 0318)

A second surgery was performed by Dr. Dyan on December 11, 2012. (JE 44 AT 0313) The postoperative diagnosis was right shoulder recurrent large rotator cuff tear with subacromial impingement.
Following a period of convalescence at home Soliman returned to formal physical therapy at One-on-One on January 21, 2013. His initial complaints were right shoulder weakness and pain ranging from five at best to 9 at worst, (JE46 p. 0042). He was seen on six occasions, from January 21 to February 7, 2013 each visit recorded the same pain ratings five at best and nine at worst, (JE46 p. 0046- 58).

He was then taken off formal physical therapy by Dr. Dyan and ordered to remain home at rest, until Jan. 3th, 2013 when it was thought he might return to therapy, (JE46 p. 0060). The history recorded in the theraphy notes, at (*id* 0060) reads as follows: "After the second surgery patient was receiving PT services three times per week until February 2013 when M.D. advised patient to hold from PT to allow rotator cuff to heal on its own, patient reports that he has been seeing his M.D. once a month since the second surgery and has complained of right arm pain and weakness."

His current complaints recorded on a PT note of September 4, 2013 was the following: "patient complaints of right arm pain and weakness that limits typical ADL's.[6] Unable to lift or lower right arm. Difficulty bringing a cup to his mouth secondary to increase pain and weakness reports that M.D. is aware of these deficits. Patient is right-hand dominant." Pain scale recordings were: worst 7 best 7. The same complaints and pain scale recordings were reported through September 30, 2015.

On October 2, 2013 the plaintiff reported that he felt as if "his shoulder was going to dislocate". On October 10th plaintiff reported "clicking sensations in the shoulder".

On October 16 plaintiff complained of "right arm pain and weakness limiting his activities of daily living, unable to lift the lower the right arm, difficulty bringing a cup to his mouth secondary to increase pain and weakness" His worst pain was reported at 6 best at 4.

The same symptoms continue to be reported through November and early December. On December 11, 2013 the physical therapy note records the following (JE 46 p 0106) patients or M.D. recently stated that patient should avoid PROM (passive range of motion ) at PT and stick to pain-free therapy only. Patient still has complaints of right arm pain and weakness that limits typical activities of daily living. Unable to lift the lower right arm difficulty bringing a cup to his mouth secondary to increase pain and weakness. Feels like he has made very little improvement. Pain scale recorded worst 7 best 5/ pain description reported as "sharp.

The same complaints, symptoms reports of pain, lack of improvement, continue to be reported throughout December 2013 to January 6, 2014 (id pg 0120)

on January 8, 2014 plaintiff stated he "feels very weak, right shoulder fatigues quickly". Pain scale notations were worst 9 - best 5. On January 15, 2014 pain is reported; worst 8 best 4. On January 29 plaintiff reported numbness of the right shoulder and that he planned to see his doctor this Friday. *(id* pg 0132) PT was discontinued on Feb.5th 2014 *(id* pg 0132), and did not resume until 11/5/14 *(id* pg 0132).

An office note by Dr. Dion dated January 31, 2014 notes a history of difficulty with the right shoulder with pain. His Plan was to have an MR Arthrogram (JE 44 p. 0280) which

---

[6] ADL -activities of daily living

11

was done March 4, 2014 *(id* p. 0375) in addition an MRI was also done same date ( *id* p. 0373).

The MRI report states the following: "there is a massive rotator cuff tear involving complete supraspinatus and infraspinatus tendons from their tuberosity insertions. The torn tendons are retracted to the glenohumeral joint and there is a greater degree of muscle atrophy than seen previously"... There is a degenerative tear at the base of the superior labrum; the remainder of the labrum is markedly diminutive due to extensive degenerative tearing."

Plaintiff was first evaluated by Dr. Cuomo on December 2n 2013. A second evaluation occurred on April 30th 2014 at which time Dr. Cuomo had the opportunity to see the MRI report of March 4th 2014. She interpreted this as a massive read tear with significant retraction and atrophy of the muscles. In her opinion the infraspinatus was probably not repairable but that there was a possibility of repairing the supraspinatus tendon. Her opinion was that the prognosis was poor and at best a 50-50 chance of success in light of the two prior surgeries.

Surgery was performed July 22, 2014, (JE 45 p. 0392). Surgery confirmed her reading of the MRI plus additional findings not seen on MRI which included failure at the tendon suture interface with multiple loose sutures requiring removal and extra articular mobilization with cuff repair and revision decompression.

Dr. Cuomo's Plan following surgery was to immobilize the plaintiff for a prolonged period of time to protect the repair as much as possible. However when she saw him again on Aug 4th 2013, plaintiff reported that 2 weeks following the surgery he suffered a cardiac event which required placement of a stent and the unfortunate removal of the sling by healthcare workers. She ordered Soliman to continue wearing a sling for an additional 7-8 weeks. (Tr. 350)

Soliman was next seen September 17 and then again October 29, 2014 at which time he was complaining of pain with range of motion and with use of the arm, he did not think the pain level was improving. (Transcript page 353)

Physical therapy was ordered and commenced on February 4, 2015.

Following a period of physical therapy he was seen next by Dr. Cuomo on April 15, 2015 at which time he was complaining of significant fatigue and pain with use of the arm and without improvement in his activity level.

Another MRI was ordered to determine if a re-tear had occurred. (Tr. 355) This MRI (Plaintiff's Exh 95) showed there not only a re-tear of both tendons and that they were retracted further than previously. In addition, extensive degeneration also was noted, described as "fatty atrophy where the muscle that attaches to the tendon atrophies." As explained by Dr. Cuomo, shrinkage occurs and fat fills in the spaces between the fibers of the tendon. It is a manifestation of further progression of a degenerative torn tendon. In addition to the head of the humerus was starting to ride up because the rotator cuff is unable to push the ball down the bigger the tear the weaker the tendons, the ball starts to ride up. (Tr.357) Dr. Cuomo also discussed significant changes in the cartilage indicating that Plaintiff was starting to get arthritis and that the entire process was progressing, bigger tear, weaker tendon, degenerative cartilage and arthritis which can lead to what is called "cuff tear arthropy" which is defined as arthritis secondary to a very large rotator cuff tear (Tr. 357-8) Dr. Cuomo further went on to explain that all these changes were causally related to the initial two tears of the rotator cuff muscles, as a natural progression.

On June 3, 2015 Dr. Cuomo explained the available options. At that visit the plaintiff stated he had no change in symptoms or its function and was having more burning pain down the arm. She was of the opinion that the condition was not repairable and that the only option was a "reverse total shoulder replacement". She described this as inserting a new ball and socket which does not replace the tendons but which places the ball on the socket side and the socket on the ball side. As explained, this changes the mechanics of the joint so that it allows the deltoid, the outside muscle to be the primary elevator of the arm. It is an option for patients who have no rotator cuff left to work with, or which can be repaired and who cannot elevate their ROM and also have arthritis associated with it. (TR 362) She explained the revision rate for this type of surgery to be 5 to 7 years, which means the plaintiff is considered to be young for this type of surgery, that it is more suitable for people older than 70. She further stated that to opt for this surgery meant plaintiff would be looking at a number of revision surgeries. (TR 363)

On September 14, 2015 the next evaluation, plaintiff elected to forgo the surgery, which decision in Dr. Cuomo's opinion was totally reasonable particularly after three surgeries and knowing that at 63 he would be facing more surgeries.

Plaintiff also testified as to his reasons for declining the surgery. He testified in substance that when he was told Dr. Cuomo would have to replace his shoulder and that this has to be done every six or seven years "of course I told her no", ... "I got scared honestly. I already went through three operations" ... not effective and the problem is every 6 to 7 years. Anybody will be scared." Tr 110-111)

Dr. Cuomo also assessed the functionality of his arm and shoulder, on that occasion which she estimated as a 75% loss of use. Her prognosis was that it would not get better and that he will have days with varying degrees of pain affected by whether affected by fatigue without ever improving; "it's hard to get much worse but it can, I mean he can barely lift it now."

Q. Is it a painful situation?
A. yes it is painful
Q Movement at certain activities?
A. Pain, it is even worse, these (conditions) are notoriously painful at night when you can't sleep, you can't brush her teeth and just minimal activities of daily living that's very uncomfortable. (TR 367)

In terms of pain relief Dr. Cuomo said that taking Percocet or analgesics for the rest of your life was not really an option. She recommended pain management which in her opinion could provide less pain and provide some functional ability to let the arm a little more because you are in less pain.

Dr. Cuomo wrote a prescription for pain management (Plt Exh 96) which she believed would be effective. As she saw it, this field has various ways, medications injections, trigger points, biofeedback to get you to a point where you are comfortable enough to function better. (Tr. 368) Plaintiff took this option and testified that he saw Dr. Sosner, his report Plaintiffs' Exh 80) is not in evidence. Pain management was not available. Defendants did not authorize it and this court ruled that Maintenance and Cure does not extend to pain management in the present circumstances, (Proceeding 537-538)

Notwithstanding, the court's ruling does not detract from the fact that plaintiff suffers daily with significant pain. In reality the failure of the law to alleviate it via M&C and defendant's decision not to voluntarily fund it, only serves to increases the damages.

14

When asked if he was willing to undergo pain management as proposed by Dr. Sosner, plaintiff stated " I wish I can go to anyone who can help me not feel the pain (Tr 111).

Plaintiff also testified as to the huge impact the past five years have had on his life, (Tr. 125) described as "the worst in his life" ... I don't eat good, I don't sleep I don't go to the beach, I can't swim, I was always on the beach during the whole summer used to turn black from sun, my life sucks because I have no money used to make seven to eight thousand a month now and make nothing. When asked what his living arrangements consisted of, he was unable to continue, he broke down in tears explaining that he shares one bedroom apartment with two other people. "I don't want to talk about that" (Tr. 126)

In terms of functional limitations he demonstrated how he has to keep his arm close to his body "to keep to myself like this" and only to use it for light things like a cup of coffee (Tr. 124)

He was asked to stand up. On doing so, he stated it was painful. To move his right hand he used his left. He next attempted to pick up a bottle of water and on doing so stated, " something – something here is like locking my shoulder".

"My shoulder is no longer the same. It's changing. It's not my (right) shoulder anymore. Right now I'm left-handed. That's it I have to use my left forever." (Tr. 124)

He next demonstrated how his right arm hangs in the simple act of walking. He stated that when he walks only his left arm swings (Tr. 125)

**Summary**
The totality of the evidence medical and otherwise demonstrates that Plaintiff has suffered tremendously both physically and mentally for the past five years and will continue to suffer tremendously in the future for the remainder of his life as his condition continues to deteriorate. For the past five years his life has revolved around doctors, physical therapy, surgery, diagnostic testing while living in cramped living conditions without sufficient money to feed himself property. He was at one time a well paid, highly respected mariner - working in a profession he dearly loved and hoped to be able to continue for as long as his health would allow. He was at one time able to provide financially for his family consisting of his wife, children, brothers and sisters and no doubt relished in the comfort of knowing that as the father, he was always there to take care their needs. He was at one time a person who had excellent health. All of this

changed drastically. Physically, half the man he was, unable to do any gainful employment, unable to engage in normal recreations activities, struggling with activities of daily living, knowing after listening to Dr. Cuomo that it will not get better but only worsen, and living in deplorable conditions that he could not even bring himself to discuss. This is the type of misfortune that sends most people into long term psychiatric care with anxiety medications. It is a tribute to Soliman that he is able to mentally and physically endure these hardships silently.

Attached are **Exh 1** are a small complication of verdicts which show the courts award of pain and suffering in this case is on the conservative side. In none did any plaintiff under go as many surgeries as Soliman, underwent.

Dated NY, NY November 28th, 2016

Ralph J. Mellusi / Tabak Mellusi & Shisha 29 Broadway Suite 2311, N.Y.N.Y. 10006
Tel: 212 (962-1590)  Cell 917 (584-4665)  Rjmellusi@Sealawyers.com

/s/ Ralph J. Mellusi

cc: J. Walsh Esq.