UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

No. 14-cv-5951 (RER)

MOHAMMED SOLIMAN,

Plaintiff,

VERSE

MAERSK LINE LTD,

Defendants.

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

January 26 2017

**RAMON E. REYES, JR., U.S.M.J.**

Mohammed Soliman ("Soliman") commenced this action against defendant Maersk Line Limited ("Maersk") for Jones Act Negligence, 46 U.S.C. § 30104, and general maritime unseaworthiness, after suffering a debilitating shoulder injury during the course of his duties as an Able Bodied Seaman ("ABS") aboard the Maersk Idaho (the "Idaho"). (Dkt. No. 1). Based on testimony received during the course of a bench trial and additional depositions submitted by both parties, I conclude that Maersk is liable for negligence under the Jones Act. I further conclude that Soliman, through his own negligence, was fifty percent at fault. As such, I award Soliman damages in the amount of $638,603.

**BACKGROUND**

In October of 2011, Soliman was employed as an ABS aboard the Idaho, a United States flagged containership. On October 22, while engaged in garbage disposal in the port of Algeciras, Spain, Soliman suffered a torn rotator cuff in his right shoulder. Following his injury, Soliman underwent three failed surgeries and has been unable to return to the profession he had practiced for 38 years.

A. Soliman

Soliman was born in Alexandria Egypt in 1950. (Testimony of Mohammed Soliman ("Soliman") 43:3-6). In 1973, he began what would ultimately become a 38-year career as a seaman. (Soliman 44:4-6). While attending maritime school in Egypt, (Soliman 157:20-25), he received instruction

1

on maritime safety and proper lifting, including the importance of keeping his arm by his side, rather than extended, when lifting. (Soliman 158:13-25). After graduating, he spent 18 years sailing for the Egyptian Navigation Company. (Soliman 44:10-18). In 1990, Soliman immigrated to the United States, working for various shipyards before joining the Seafarers Maritime Union in 2000 and returning to work as a seaman aboard United States flagged vessels. (Soliman 46:24-47:1, 47:10-22, 48:1-6). By 2009, Soliman was sailing for Maersk, first aboard the Maersk Montana and later as an ABS on the Idaho. (Joint Ex. 7).

Soliman was regarded as highly skilled and competent. (Deposition Testimony of Paul August Willers ("Willers") 39:11-13). Captain Paul Willers, Master of the Idaho, testified that he "would evaluate [Soliman] very well. I would have put him above average[.]"[1] *Id*. Soliman himself testified that he did not need instruction because he had been sailing for so long. (Soliman 181:24-25) ("I know a lot – I know a lot about safety. I don't need…somebody tells me that again."). Prior to the instant accident Soliman had only suffered two injuries during his long career, (Soliman 45:19-21; 97:20-98:12; 102:22-103:3), including one aboard the Idaho just prior to the injury that prompted this litigation. (Willers 97:20-98:12). On that occasion, Soliman strained his left shoulder while pulling a mooring line. *Id*. Following treatment, he promptly returned to work. (Soliman 98:7-12; Df. Ex. A).

B. <u>The Accident</u>

At the time of the instant injury, Soliman was assisting with garbage disposal in the port of Algeciras, Spain. (Soliman 50:25-51:2, 54:6-12). Aboard the Idaho, trash is generally gathered from around the ship and collected in the garbage room, located on the port side of the main deck. (Willers 22:18-19). On longer voyages, where space becomes limited, additional room is made by compacting the garbage bags in a hydraulic press located in the garbage room. (Soliman 77:1-5, Willers 25:4-10). Compacted garbage is kept in heavy duty black bags. (Deposition Testimony of Robert Neilson ("Neilson") 37:5-8). Captain Willers testified that bags were rarely compacted before arrival in Algeciras, because it was such a short trip from the preceding port. (Willers 172:5-10). First Mate Robert Neilson, who assisted Soliman with garbage disposal, testified that the offending bag was green, not black, (Neilson 38:11-12), suggesting it was not compacted. Soliman offered no evidence that the offending bag was overweight or otherwise dangerous due to compacting.

When unloading garbage in Algeciras, the Idaho usually follows the same procedure. After reaching the relative calm of break water, crewmembers carry garbage bags from the garbage room, up a flight of steps and across the breadth of the ship to starboard side A-Deck. (Soliman 172:12-16; 179:2-6). Garbage is then staged for disposal on the exterior portion of starboard A-Deck. (Soliman 179:21-190:1; Joint Ex. 17-21). The location is tight and cluttered. A ladder runs along the bulkhead. (Soliman 55:10-14; Joint Ex. 2). A narrow passage exists between the ladder and the rail. *Id*. Below the

---

[1] This testimony is admitted not "to prove that on [this] occasion [Soliman] acted in accordance with a character or trait[,]" as prohibited under F.R.E. 404(a)(1), but rather to demonstrate that Soliman possessed the requisite skill and knowledge to appreciate the risks associated with this particular task.

2

ladder is a door. (Soliman 55:5-56:18; Joint Ex. 21). Between the door and ladder there is a small window. (Soliman 55:5-7; Joint Ex. 17-21). Along the bulkhead are multiple protrusions, most notably a portal for passing a fire hose and a handhold roughly the proportions of a towel rack, located at the same height as the first and fourth steps of the ladder. (Soliman 55:5-56:18; Joint Ex. 17-21). The garbage bags are stored against the bulkhead beneath the ladder. (Soliman 56:4-25; Joint Ex 11). A net is laid out on the ground between the bags and the exterior rail, leaving a very narrow strip of deck where a seaman can stand. (Soliman 58:16-19; Joint Ex. 2). According to Soliman, "[t]he net is right next to me…It's a small space and I could step on the net and slip." (Soliman 74:14-16; Joint Ex. 18). Crewmembers then pull bags from the pile, placing them in the net until it is full, at which point the Suez Crane is used to lift the net and lower it onto the dock for disposal. (Soliman 58:11-16).

On the day of Soliman's injury, garbage bags had been piled approximately seven to eight feet high beneath the A-Deck ladder. (Soliman 54:23-55:1, 56:23-25). After stacking the bags, Soliman and another crewmember began pulling bags from the stack into the net. (Soliman 54:9-12, 64:22-65:7). Soliman was closer to the base of the ladder, facing stern and pulling with his right arm. (Soliman 68:22-24, 69:20-25). As he grabbed the bags, Soliman's arm was bent at the elbow, and his hand was at shoulder height. (Soliman 72:22-25). His hand was turned halfway between palm up and palm down, similar to a handshake. (Soliman 81:8-13). After grasping each bag with his right hand, Soliman would pull his arm down and across his body in a 90 degree swing. (Soliman 81:19-23). This was the method used by all members of the Idaho crew. (Soliman 74:1-21).

After successfully pulling four to six bags, Soliman reached for a bag located at approximately shoulder height. (Soliman 72:11-17, 73:3-5). As he pulled, Soliman felt a sudden sharp pain and tugging sensation in his shoulder. (Soliman 73:12-14). The bag did not move. (Soliman 73:16-18). Soliman testified to experiencing "[a] lot of pain and my arm hung, like I couldn't lift it. And I was screaming from pain[.]" (Soliman 73:19-21). He was sedated by the Second Mate and slept in his bunk until the following day, at which point he was seen by a doctor. (Soliman 76:1-7, 91:5-10; Df. Ex. A). The doctor found Soliman unfit for duty, at which point Maersk provided transportation back to the United States. (Soliman 95:1-3)

C. Safety Procedures Aboard The Idaho

The Idaho is required to comply with the International Management Code for the Safe Operation of Ships and for Pollution Prevention ("ISM"), which mandates that United States flagged vessels develop a safety management system ("SMS") that provides safeguards against all identified risks. 33 C.F.R. §96.230(b). Consistent with this mandate, Maersk has a SMS, which was audited and found compliant. (Testimony of Mitchell Stoller ("Stoller") 284:17-285:1; Joint Ex. 13-14). According to Maersk's expert witness, risks are identified on the basis of "common sense, and it's probably based on past experience." (Testimony of John Lawrence Bergin ("Bergin") 302:6-7). Under Maersk's SMS, a risk assessment must be conducted before any task that involves an identified risk. (Willers 150:1-3).

Maersk provides crewmembers with training on proper lifting, including several pages dedicated to the subject in its safety handbook. (Joint Ex. 93 at 30-33). Prior to his injury, Maersk invited Soliman and other

3

crewmembers to attend a conference entitled "Safety in Motion," which addressed proper lifting technique. (Soliman 116:19-117:2; Stoller 307:14-308:3). Soliman did not to attend. (Soliman 118:2-22). Soliman's own expert witness commended Maersk for holding the conference, which he characterized as above and beyond what most companies offer. (Stoller 308:8-14).

While Maersk appears to have provided extensive training and instruction on proper lifting, the company failed to provide any training on safe pulling. (Deposition Testimony of Anderson Warwick, ("Warwick") 113:1-5; Willers 56:14-25). When asked if crewmembers were trained in proper pulling, Captain Willers testified that "[w]hen everybody comes on board there's a safety manual given out to them that gives instruction on how people are to proceed for lifting things…that's the only instruction[.]" (Willers 56:14-25). While weekly safety meetings occurred, there is no indication that garbage disposal or pulling techniques were ever discussed. (Willers 148:12-149:18). The Maersk Safety Handbook contains three pages, replete with diagrams, on safe lifting, but makes no mention of pulling. (Joint Ex. 93 at 30-33). No training regarding the pulling of trash bags was ever provided. (Soliman 83:17-25).

Chief Mate Anderson Warwick, who was officially designated to supervise garbage disposal, witnessed Soliman using a one armed sideways pull to move the garbage bags but did not comment on it, regarding it as the correct approach to routine work. (Warwick 27:6-19). Captain Willers admitted that he had never even considered whether the pulling technique was safe or appropriate. (Willers 54:17-23) ("Q: Why is it that this particular type of job…is a one hand job rather than two hands? A: Interesting question. I don't really have an answer for that except that's the way people normally pick up bags and move them."). Following the accident, but before learning the true nature of Soliman's injury, Captain Willers suggested that additional training in repetitive stress injuries was necessary. (Willers 77:16-78:25). There is no indication that any risk assessment was ever conducted for this task.

D. Soliman's Injuries

As a result of the accident, Soliman suffered a torn rotator cuff that left his right arm largely useless. (Testimony of Alan Dyan ("Dyan") 469:13-14). In an effort to regain the use of his arm, Soliman underwent three separate surgeries. (Soliman 107:2-8). Prior to undergoing his third surgery Dr. Frances Cuomo, Soliman's second treating physician, "found him to have a very limited ability to lift the right shoulder. His elevation of the arm [was] 90 degrees on the right side[,]" as opposed to 180 degrees on the left. (Testimony of Frances Cuomo ("Cuomo") 335:12-15). Dr. Cuomo further found that Soliman "had limited internal rotation[,]" was "extremely weak[,]" and "had some decreased sensation in the area of the deltoid[.]" (Cuomo 335:15-25). Based on a review of an MRI, Dr. Cuomo described the tear as "massive." (Cuomo 345:8-9).

Dr. Edward Toriello, an orthopedic surgeon who testified as an expert witness for Maersk, argued that Soliman had an asymptomatic tear prior to October 22, which only manifested at the time of the accident. (Testimony of Edward Toriello ("Toriello") 438:24-439:14). Dr. Cuomo testified that a sizable number of people suffer from asymptomatic torn rotator cuffs. (Cuomo 379:11-382:11). However, Dr. Cuomo did not believe Soliman was such a person. (Cuomo 344:23-345:1, 384:5-389:25). Rather, she testified that the injury appear to

be acute and consistent with an individual traumatic event. (Cuomo 390:8-9). Further, Dr. Alan Dyan, Soliman's first treating physician who testified from firsthand knowledge gained during the course of two surgeries, stated that Soliman did not have a pre-existing injury. (Dyan 491:1-495:1). Rather, he opined that Soliman's injury was traumatic and recently onset. (Dyan 489:18-490:17). Having weighed the testimony, I credit the opinions of Soliman's treating physicians.

Today, Soliman suffers from a dramatically reduced range of motion in his right arm, which causes him daily pain. (Soliman 124:4-21; Cuomo 353:10-23, 367:5-10). Soliman testified that he cannot move his right arm away from his body and cannot lift anything other than the lightest of objects. (Soliman 124:1-10). There is no indication that this pain will reduce as time passes or that his range of motion or physical fitness will improve. (Cuomo 362:4-10). Rather, the evidence suggests his condition will only continue to deteriorate. (Cuomo 357:21-24) ("There's also significant changes in the cartilage, he's starting to get arthritis now. So, the whole process is progressing, bigger tear, weaker tendon, degenerative cartilage[.]"). He is currently experiencing "at least 75 percent loss of use." (Cuomo 366:25). According to the testimony of Soliman's forensic economist, Soliman has experienced a total economic loss of $277,206. (Testimony of Michael Soundry ("Soundry") 412:1-2). This is based on the expectation that Soliman would have continued working until he was sixty-six and a half years old, the end of his statistical work life expectancy, an assumption I accept. (Soundry 411:22-25).

## DISCUSSION

### I. Liability

When a seaman is injured during the course of his employment, he may bring claims under the Jones Act for negligence or under general maritime law for unseaworthiness. It is well-settled that maritime employers are bound by a "dut[y] to avoid unseaworthiness and negligence," and that "injuries caused by a breach of either duty are compensable." *Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532, U.S. 811, 813, 121 S.Ct. 1927, 150 L.Ed.2d 34 (2001). While an injury may justify relief under both causes of action, the applicable standards for each are different.

#### A. The Jones Act

Under the Jones Act, "[a] seaman injured in the course of employment…may elect to bring a civil action…against [his] employer." 46 U.S.C. § 30104. The Jones Act incorporates laws "regulating recovery for personal injury to…a railway employee[.]" *Id*. This includes the Federal Employers' Liability Act ("FELA"), which states in relevant part that employers are liable for "injury resulting in whole or in part from [their] negligence[.]" 45 U.S.C. § 51; s*ee also Wills v. Amerada Hess Corp.*, 379 F.3d 32 (2d Cir. 2004) (relying on FELA cases to interpret the Jones Act). The *prima facie* case for Jones Act negligence requires the plaintiff to prove "(1) that a dangerous condition actually existed on the ship; (2) that the defendant shipowner had notice of the dangerous condition and should have reasonably anticipated the plaintiff might be injured by it; and (3) that if the shipowner was negligent, such negligence proximately caused the plaintiff's injuries." *Deibold v. Moore McCormack Bulk Transport Lines, Inc.*, 805 F.2d 55, 58 (2d Cir. 1986) (internal

5

quotations omitted); *see also Seemann v. Coastal Environmental Group, Inc.*, -- F.Supp.3d --, 2016 WL 7015728, at *4 (E.D.N.Y. Nov. 29, 2016).

Where a maritime employer acts negligently, the broad remedial nature of the Jones Act demands that causation be judged under a reduced standard. *See Wills*, 379 F.3d at 47 n.8 ("Under both [the Jones Act and FELA], the plaintiff bears a reduced burden of proof with respect to causation."). Under this reduced standard, an employer is liable to its employee if "employer negligence played any part, even the slightest, in producing the injury[.]" *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957); *see also Martinez v. City of New York*, No. 14 Civ. 632, 2016 WL 1276449, at *2 (S.D.N.Y. Mar. 30, 2016) ("The standard for a Jones Act claim is a 'low and liberal' one, requiring only that 'the proofs justify with reason the conclusion that employer negligence played any part, *even the slightest* in producing the injury[.]'") (quoting *Diebold*, 805 F.2d at 57 (emphasis in original); *Nasser v. CSX Lines, LLC*, 191 F.Supp.2d 307, 313 (E.D.N.Y. 2002) (articulating the same principle). Evidence of causation may be entirely circumstantial and direct proof is not required. *See Rogers*, 353 U.S. at 507.

In the Second Circuit, this reduced standard also applies to proving a breach of the duty of care. The Jones Act "places a….duty on the [ship-]owner to provide a reasonably safe workplace." *Oxley v. City of New York*, 923 F.2d 22, 25 (2d Cir. 1991). To satisfy this duty, the ship-owner must "exercise reasonable care to protect its employees from known hazards or potential hazards of which it should have known[.]" *Marasa v. Atlantic Sounding Co., Inc.*, 557 Fed.Appx. 14, 17 (2d Cir. 2014). This imposes a heightened duty of care of ship-owners. *See id*; *see also Williams v. Long Island R.R.*, 196 F.3d 402, 406 (2d Cir. 1999) ("[T]his Circuit has explicitly stated that it construes the statute, in light of its broad remedial nature, as creating a relaxed standard for negligence as well as causation.") (internal quotations and citations omitted). Under this reduced standard, "an employer may be held liable…for risks that would be too remote to support liability under common law [negligence.]" *Williams*, 196 F.3d at 407.

Maersk incorrectly argues that *Williams* is no longer good law in light of the Supreme Court's 2001 ruling in *CSX Transp. Inc. v. McBride*, 564 U.S. 685, 131 S.Ct. 2630, 180 L.Ed.2d 637 (2011). (Dkt. No. 36 (Defendant's Post-Trial Brief ("Df. Br.")) at 14). This interpretation is too broad. The Supreme Court's discussion of the reduced standard in the context of causation does not, by implication, provide this Court with authority to reject the clear precedent of the Second Circuit. Maersk further argues that the Second Circuit has encouraged trial courts to apply the *CSX* standard. (Df. Br. at 14-15) (citing *Stowe v. National Railroad Passenger Corp. (Amtrak)*, 481 Fed.Appx. 701 (2012) (summary order)). However, this circuit has continued to apply *Williams* as recently as 2015, three years after *Stowe*. *See Coale v. Metro-North Commuter R. Co.*, 621 Fed.Appx. 13, 14 (2d Cir. 2015) (summary order) ("Courts apply a more relaxed standard of both negligence and causation to FELA negligence claims than those arising under common law."). In any event, even under the common law negligence standard Soliman has met his burden.

B.     Unseaworthiness

Under general maritime law, "[t]he doctrine of seaworthiness establishes that every shipowner owes an absolute and non-

delegable duty to seamen properly aboard its vessel to provide a seaworthy ship." *Martinez*, 2016 WL 126449, at *2 (internal quotations omitted.). Under the principles of seaworthiness, "an owner has an absolute duty to furnish a ship, crew, and appurtenances reasonably fit for their intended services." *Oxley*, 923 F.2d at 24; *see also GTS Indus. S.A. v. S/S Havtjeld*, 68 F.3d 1531, 1531 (2d Cir. 1995) ("Seaworthiness is defined as the ability of a vessel adequately to perform the particular services required of her on the voyage she undertakes."). A ship is deemed unseaworthy when it is "insufficiently or defectively equipped." *Waldron v. Moore-McCormack Lines, Inc.*, 386 U.S. 724, 726, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967). Additionally, it is widely acknowledged that "a vessel being operated by an incompetent…crew is considered unseaworthy." *In re Complaint of Messia,* 574 F.3d 119, 127 (2d Cir. 2009). A crew is incompetent, and thus the ship unseaworthy, when the ship's owner fails to provide adequate training for the task to be performed. *See Fed. Ins. Co. v. PGG Realty, LLC*, 538 F.Supp.2d 680, 697 (S.D.N.Y. 2008). In *Marasa v. Atlantic Sounding Co., Inc.*, an otherwise fit vessel was found unseaworthy, thus entitled injured crewmembers to damages, because the "crew was not trained for the specific task…at issue" and the "defendants failed to train any of the men as to how to perform it safely." 557 Fed.Appx. 14, 18 (2d Cir. 2014) (summary order).

Liability for unseaworthiness does not depend on negligence or the owner's notice of the condition, *see Martinez v. United States*, 705 F.2d 658, 660 (2d Cir. 1983), and has therefore been characterized as "liability without fault[,]" *Oxley*, 923 F.3d at 25; *see also Martinez*, 705 F.2d at 660. Nevertheless, the "standard is not perfection[.]" *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); *see also Morton v. Berman Enterp., Inc.*, 669 F.2d 89, 91 (2d Cir. 1982). Additionally, to maintain a claim for unseaworthiness, an injured seaman must also prove causation. *Nasser*, 191 F.Supp.2d at 314. The Second Circuit has not articulated a clear causation standard. Some district courts have held that traditional standards of causation apply. *See Barlas v. United States*, 279 F.Supp.2d 201, 208 (S.D.N.Y. 2003). However, I join my fellow judges in this district in finding that a heightened causation standard applies, which requires the unseaworthiness to be substantial cause of the injury. *See Lisowski v. Reinauer Transp. Co., Inc.*, No. 03-CV-5396 (NGG), 2009 WL 763602, at *14 (E.D.N.Y. Mar. 23, 2009); *see also Nasser*, 191 F.Supp.2d at 315 ("Causation is established when it is shown that the unseaworthiness played a substantial part in bringing about or actually causing the injury[.]) (internal quotations omitted).

## C. Breach of Duty

Maersk has breached its duty of care under both the Jones Act and general maritime law by failing to conduct a risk assessment of its garbage disposal procedures and failing train its crew in safe pulling techniques.

Under both the ISM and Maersk's SMS, risk assessments should be conducted before engaging in potentially hazardous tasks. The goal of such assessments is to ensure that the crew has adequate training and that sufficient protective measures are taken to prevent injury. At trial, witnesses for both sides were unable to articulate a bright line rule for when a risk assessment is necessary. Maersk argued that a risk assessment was not necessary here because garbage disposal is a routine task. (Df. Br. at 6-7). I am inclined to agree that it would

impose too high a burden on the ship's officers if they were required to conduct a risk assessment before every routine task. However, the fact that no risk assessment was ever conducted is troubling.

Like all complicated shipboard tasks, the method of garbage disposal aboard the Idaho is replete with risks. Garbage aboard the Idaho must be carried from the garbage room, up a ladder to A-Deck, and across the breadth of the ship. It is then stacked several feet high in a tight space that affords crewmembers limited mobility. This work is often done while the ship is in motion. The location where the bags are staged is not only cramped, but has multiple physical protrusions that might interfere with the work. Once docked, crewmembers must pull bags in a space which does not allow for much turning or movement without fear of falling. This situation presents many potential risks, such as falling crewmembers or bags, which might have been identified by a proper risk assessment. While Maersk may regard these risks as reasonable, it cannot deny that they exist. Captain Willers himself suggested that additional training might be warranted following Soliman's injury. That the training he recommended was not related to Soliman's injury does not change the simple truth that risks did exist and were not accounted for.

Despite this, there is no indication that Maersk ever conducted a proper risk assessment. Rather, they created a process without consideration for the safety of the crew and then avoided future risk assessments by noting that the policy was already in place and thus routine. In the dangerous world of maritime labor, such willful disregard for the safety of seamen is simply unacceptable.

More significantly, Maersk has breached its duty of care by failing to provide training on safe pulling techniques. That Maersk has consistently provided training on proper lifting is commendable. However, lifting is not the only task that may result in injury. It is well established that pulling may result in serious injuries. During a pull, an individual places pressure on their arm, shoulder, and back. Depending on the size, weight, and shape of the object being pulled, this can result in a host of injuries, including a torn rotator cuff. The garbage disposal process presented all these risks, which might have been noted and accounted for following a risk assessment.

On the same trip that Soliman was injured, he suffered a minor injury to his left shoulder. This injury was occurred while pulling a mooring line. Not only are pulling injuries common, but Soliman had suffered such an injury to his left shoulder, while aboard the Idaho, just prior to this accident. If Maersk was somehow unaware of the risks, Soliman's prior injury should have put them on notice. Additionally, Captain Stoller identified and referenced multiple authorities that consider pulling to be a potentially dangerous activity. Maersk argues that these authorities do not represent maritime industry standard (Df.'s Br. at 8). This alone is not dispositive, and this Court may consider them for the purpose of determining negligence. *See Jones v. Spentonbush-Red Star Co*, 155 F.3d 587, 595 (2d Cir. 1998) (Finding non-mandatory authorities "evidence of the standard of care, the violation of which may be accepted or rejected as proof of negligence by the trier of fact according to the sum total of all the evidence."

Ship owners must guard against identified dangers. Maersk's own SMS requires its officers and agents to guard against identified risks of injury to

crewmembers. Captain Bergin, testifying on behalf of Maersk, stated that a danger is identified through common sense. Common sense states, in no uncertain terms, that pulling heavy, awkward, or unwieldy objects can result in injury. Common sense further dictates that pulling with a single outstretched arm, extending directly from the shoulder, in conjunction with a twist of the back, is dangerous. These dangers could have been mitigated through proper training.

D. Causation

Soliman has offered sufficient evidence to satisfy the causation standard under the Jones Act, but not the heightened standard under general maritime law for unseaworthiness. The facts establish that Soliman suffered his injury while pulling garbage bags into the Suez Crane net on A-Deck. Maersk's breach of duty in failing to afford any training or guidance on safe pulling resulted in Soliman using a dangerous pulling technique to move the garbage bags, with his arm extended and his back twisting. This exposed Soliman to risk of back and shoulder injury. While pulling, Soliman did in fact suffer a serious shoulder injury. Based on the facts and medical evidence presented, it is reasonable to infer that had Soliman not pulled a bag, placing his arm in a vulnerable position in the process, he would not have suffered a torn rotator cuff. This is sufficient to satisfy the reduced causation standard under the Jones Act. However, this is insufficient to meet the heightened causation standard applicable to unseaworthiness claims.

E. Comparative Negligence

The amount of Soliman's damages must be reduced by any comparative negligence on his part. The doctrine of comparative negligence applies to the Jones Act. *See Pope & Talbot, Inc. v. Hawn*, 346 U.S. 424, 429 (1939); *see also Ammar v. American Export Lines, Inc.*, 326 F.2d 955, 959-60 (2d Cir. 1964), *cert. denied*, 379 U.S. 824 (1964). Where a seaman's negligence is a contributing factor in his injury, recovery should be reduced proportionately. *Id.* The relaxed standard of causation under the Jones Act also applies to issues of comparative negligence. *See Norfolk S. Railway Co. v. Sorrell*, 549 U.S. 158, 160 (2007) ("We conclude that the causation standard under FELA should be the same for both [direct and comparative] negligence[.]").The doctrine of assumption of the risk does not apply. *See Socony-Vacuum Oil*, 305 U.S. 424, 428, 59 S.Ct. 262, 83 L.Ed. 265 (1939).

Soliman was an experienced sailor who had served on American and Egyptian flagged vessels for many years. During this time, he received training in lifting and materials handling, and instruction that he could refuse to lift or carry any item too heavy to transport safely. During his own testimony, Soliman stated without reservation that he required no instruction or training because of his experience and familiarity with his work. Based on his experience and knowledge, he should have been able to appreciate the risks involved in one armed pulling.

This knowledge is hardly abstract, and I do not conclude that Soliman was negligent based solely on his experience. Rather, I note that Soliman had performed this precise task many times before and, following his recent left shoulder injury, was capable of appreciating the risk of improper pulling. Significantly, while a student at an Egyptian sailing school, Soliman was taught never to lift with his arm extended. This was one of a handful of lessons he was able to recount during testimony when asked about his education. Despite this, Soliman pulled

garbage with his arm extended and in a vulnerable possession.

I also reject Soliman's contention that the one arm pull was the only way to accomplish the task at hand. The testimony and photographs admitted into evidence clearly show that a safer two armed pull was possible. While the one armed pull may have been more expedient, it was clearly fraught with greater risk. Rather than apply his experience to ensure his own safety, Soliman simply conformed to the behavior of his fellow crewmembers. Failing to use his own training to minimize the risk of injury. Under the reduced standard that governs Jones Act negligence, Soliman was comparatively negligent. Having reviewed Soliman's qualifications and failures, I conclude that he was fifty percent at fault.

## II.    Damages

It is clear that Soliman has suffered over five years of remarkable pain and suffering. He has undergone three operations - all of which have failed - daily pain, and significant restrictions to his mobility. As such, I conclude that he has suffered $500,000 in past pain and suffering. It is also clear that his pain will continue for the duration of his life. Discounting this future pain to its present value, *see Oliveri v. Delta S.S. Lines, Inc.*, 849 F.2d 742, 751 (2d Cir. 1988), I conclude that he is entitled to an additional $500,000 in future pain and suffering. Based on the evidence presented by Soliman's economic expert, I conclude that Soliman has suffered lost earnings in the amount of $277,206. However, Soliman is not entitled to maintenance and cure because he has reached the maximum medical recovery. *See Messier v. Bouchard Tansp.*, 688 F.3d 78, 81 (2d Cir. 2012). This represents total damages in the amount of $1,277,206. Accounting for his comparative negligence, Soliman is entitled to a damage award of $638,603.

## **CONCLUSION**

For the reasons set forth above, I find Maersk liable under the Jones Act, but not for general maritime unseaworthiness and award Soliman damages in the amount of $638,603. SO ORDERED

Dated: January 26, 2016

Brooklyn, New York
*Ramon E. Reyes, Jr.*
RAMON E. REYES, JR.
United States Magistrate Judge